# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Andre Androgus
7044 8-22
_____

Write the full name of each plaintiff.

No. _____

(To be filled out by Clerk's Office)

-against-

New York city 3 NYPD
New York Police Dept
ET. AL.
_____

Write the full name of each defendant. If you cannot fit the
names of all of the defendants in the space provided, please
write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The
names listed above must be identical to those contained in
Section IV.

## COMPLAINT
(Prisoner)

Do you want a jury trial?
☑ Yes    ☐ No

---

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

Rev. 5/6/16

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a *"Bivens"* action (against federal defendants).

☐  Violation of my federal constitutional rights

☒  Other: _____

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

*Aadee* _____ *Antrobus* _____

First Name          Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

*895 00 22 345*

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

*AMKC*

Current Place of Detention

*18 18 Hazen St*

Institutional Address

*East Elmhurst* _____ *NY* _____ *11370*

County, City                    State                    Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☒  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other: _____

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1: _New____ York____ City_____

First Name          Last Name          Shield #

Current Job Title (or other identifying information)
_City Hall_____

Current Work Address
_New York_____ NY_____ 10007_

County, City          State          Zip Code

Defendant 2: _New York City Police Dept_

First Name          Last Name          Shield #

_N.Y.P.D_

Current Job Title (or other identifying information)
_One Police Plaza_

Current Work Address
_New York_____ NY_____ 10038_

County, City          State          Zip Code

Defendant 3: _____

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 4: _____

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

## V.    STATEMENT OF CLAIM

Place(s) of occurrence: Bklyn Ny

Date(s) of occurrence: 01-31-22

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

Falsily Arrested on going on harassment of Revenge Mens Rea 1st I need a pro bono lawyer cause of orders of the DA, they block, hold and open my mail, take my evidence and retaliate against me, with serious injuries by their orders twice I submitted a writ of Habus corpus to Judge Swain in 2022 and 2023 to help me with the court answering my writ cause I'm going through ten times (10x) worst than Kalief Browder and Realtos "G" from ex cel people Busse v schrald's ep: soder for 17 months (so I need a lawyer it will be prejudicial and bias not to appoint one pun der these unconstitational treatment to mis a filing or e-c)

Now fake Arrest of on Beginning 01-25-22 I was falsily put in hudcuffs while on virtual court with hon. Jack stroller from civil/housing 141 liv ingston st Bklyn Ny 11201 case lt 010199-22 KN on Ny: M 3M super market 295 Rogers ave Bklyn Ny 11226 as said I Threaten to kill people of my job at Now if I said I was going to kill some one Judge stroller would've call the police while on virtual court or be on the transcript of my case Lt 010199 KN20 on the transcript of my (I need subpoenas expedactly

to Kings County Hospital R-Bldg where they refuse to give me my detention papers, let me go or order me to another unit cause of the peck-ni I was told not to touch phones or sit at tables from 01-25-22 to 01-31-22 pursued (as in Battered person syndrome) By the peeking order as usual no help insight Authorities told me handle my business, leader Mr. Takiana like in the nurse monitor office choose his room for his Battle reached me his Buttocks rush me and tripped I was arrest and tied on when I was never suppose to be arrested under Omh

**INJURIES:**    con't attached paper

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

False Arrest 01-25-22 and 01-31-22 several multiple serious injuries every month while Held on false charges by inmates and D-o-c from burns, cuttings, gang assaults, stabbing spraying, const violations denying mail every 3 months, taken of evidence, Denied medical

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

$7,000,000.00 punitive Damages
$7,000,000.00 compensative Damages

facts of false arrests:

1) Dcause OMH is autonomous entity with thear own rules, regulations, procedure and directives see Exhibits:

2) they tried to charge me with a old injury from Dec 21 2015 that healed before I got arrianed Exhibit:

3) Mr Israel Ankira was oriented, alert, and memory intact by 4x to time, place and Date without a clock, watch or cellphone Exhibit: (no amenisia)

4) Mr. Israel Ankira Denies injury, pain distress, discomfort or headache even medication from 07-31-22 Exhibit:

5) hyperbole lies and exaggerutions of every onus perjured statements corrected Exhibit:

6) hyperbole false diagnosis was corrected to old injury Dec 21 2015 Exhibit: corrected

7) if Mr Ankicira was oriented to time, date, and place without any sort of time piece in area and his memory intact 4x why when he says he dont remember or recall why absault or

why they didn't listen to him

D) if you deny pain and injuries how are you gonna subjectively detail the degree of pain or duration

4) why if your hospital police of c.t.v footage! and defendant requested before he was arrested 01-31-22 and every two weeks after for 16 months to kgb dy hosp, crim ct, sup ct, DA's office and nyc Hulth and Hospitals! so with your edited 25 minute video you want people to believe Robert downey Jr puts on a iron suit and flies across nyc put away the smoke, mirrors, green screens and cut and edit

1) so no testimony or pain about any assualt from the physicira who has the same problem as defendant as a fall risk with the seral numerous inconsistant statements that was corrected

## VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

**Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.**

| | |
|---|---|
| 07-14-23 | |
| Dated | Plaintiff's Signature |
| | |
| First Name | Middle Initial | Last Name |
| | |
| Prison Address | |
| | |
| County, City | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: 07 14 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_(handwritten)_

_____
*(List the name(s) of the plaintiff(s)/petitioner(s).)*      ____ Civ. _____ (____) (____)

- against -                      **AFFIRMATION OF SERVICE**

_(handwritten)_

_____
*(List the name(s) of the defendant(s)/respondent(s).)*

I, *(print your name)* _(handwritten)_ , declare under penalty of perjury that I

served a copy of the attached *(list the names of the documents you served)*: _____

_____

_____

upon all other parties in this case by *(state how you served the documents, for example, hand delivery,*

*mail, overnight express)* _(handwritten)_ _____ to the

following persons *(list the names and addresses of the people you served)*: _(handwritten)_

_(handwritten)_

_(handwritten)_

on *(date you served the document(s))* _____.

_(handwritten date)_                     _(handwritten signature)_
Dated                                    Signature

                                         _(handwritten)_
                                         Address

                                         _(handwritten)_
                                         City, State

                                         _(handwritten)_
                                         Zip

                                         _____
                                         Telephone Number

                                         _____
                                         E-Mail Address

*Rev. 01/2013*

EXHIBITS A to M 70448-22

Medical diagnosis, first statements, corrections to hyperbole All corraberates

Exhibit o to show false Arrest occured
Exhibit A: so called victim stating "he does not rem-ember being assaulted" and "Does not recall incident
objective look: "no other injuries" "no other trauma"
Exhibit B: Denies pain, Discomfort, Distress and medication
Exhibit A: Back pg. Nurse lies says punched hit wall and floor
Exhibit C: Denied pain, head ache and injuries (focal good focus)
Exhibit D: Neurological negative (nerves good intac)
Exhibit E: correction to preliminary hyperbole exaggeration
that the D.A. and court ran with about intraventricular hemm-orrhage, subarachnoid hemmorrhage (6mm sylvain fissure, no
evidence "Thats correction the fraud"+ 1.5 mm * interhemispheric
fissure and Encephalomalacia" are consistant with a
previous injury from December 21 2015 (old injury)
Exhibit E: Beck) everything stable and decreased
Exhibit f: No evidence of; mass effect, acute intraventricle
hemmorage, large territory infraction, periventricular, deep
white matter, subcortical hyperdensities, or micro vascular ischemia,
correction to preliminary report its a previous injury 12-31-15
Exhibit G: corraberates prior old injury 12-21-15
Exhibit #: "not complaining of pain" no active Bleeding
Exhibit I: "preliminary hyperbole report that the D.A. and
courts ran with views was false" old injury healed before
arraignment and Bump decreased
Exhibit J: no Bleeding seen, no lacerations
Exhibit K: memory and orientation to time, place and Date 4X
Exhibit L: corrections to they lying inconsistant statements
2) his aggitation and aggression multiple episodes every day (PRN)
3) orientated to time, place and date
Exhibit M: correction to hyperbole lies
Exhibit o: Alert and orientated
No Physical injury never assaulted

**Bingo**

NYC
HEALTH+
HOSPITALS | **Kings County** CENTER

KINGS COUNTY HOSPITAL  Patient:Akinsira, Israel
451 Clarkson Avenue
BROOKLYN NY 11203    Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

ED Provider Notes by Monisha Dilip, MD at 01/31/22 1805 (continued)
does not remember being assaulted. No other injuries noted. Level II trauma code. CTH shows small
hemorrhage in L sylvian fissure. Admit to SICU for traumatic ICH, neurosurgery on board.

Note Initiated: 01/31/2022 at 6:05 PM
Encounter Date: 1/31/2022

Chief Complaint:
Chief Complaint
Patient presents with
- Assault Victim

   *per/RN from 3e "R" bldg  states patient was assaulted by another patient head continuously hit on floor
   and wall patient became unconscious Rapid reponse was called. Patient arrived to CCT with C- collar
   LEVEL 2 code initiated by  MD HAassel. Patient noted to fall asleep in mid sentence*

History of Present Illness:

83yoM with PMx BPH, depression, schizoaffective d/o presenting with head trauma from R building. Patient
currently admitted to R building, was assaulted by another patient, his head was hit against the ground multiple
times. +LOC. Patient does not recall incident. No other trauma.    **Bingo**

History provided by:  Patient
History complicated by:  Psychiatric disorder and mental status change

History:
Past Medical History:
Diagnosis                                                                              Date



Printed on 2/4/22  9:57 AM

EXHIBIT PA

NYC
HEALTH+
HOSPITALS **Kings County** KINGS COUNTY HOSPITAL  Patient: Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203    Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

Consults by Alec Krosser, MD at 01/31/22 1737 (continued)
off bed, got kicked in head multiple times. Was bleeding and had LOC. Incontinent of urine per note as well.
~~patient~~ ~~complaining of pain~~ GCS 14 ~~~~ ~~~~ Primary survey intact, secondary with
~~~~ eye ecchymosis and dried blood, dried blood in and around mouth, ~~no active bleeding seen.~~ Will obtain CT
head, C spine given mechanism. Trauma labs. assault
EMS interventions: C-collar, IV access  and IV fluid

**Allergies:** No Known Allergies
**Home Medications:**
**Prior to Admission medications**

| Medication | Sig | Start Date | End Date | Taking? | Authorizing Provider |
|---|---|---|---|---|---|
| acetaminophen (TYLENOL) 325 MG Cap capsule | Take 2 capsules (650 mg total) by mouth every 4 (four) hours as needed for pain | 10/1/21 | | | Tatyana Braslavskaya, MD |
| amLODIPine (NORVASC) 5 MG tablet | Take 1 tablet (5 mg total) by mouth daily | 10/1/21 | | | Tatyana Braslavskaya, MD |
| ergocalciferol (ERGOCALCIFEROL) 50000 units Cap | Take 1 capsule (50,000 Units total) by mouth every 14 (fourteen) days | 10/1/21 | | | Tatyana Braslavskaya, MD |
| haloperidol (HALDOL) 2 mg/mL solution | Take 2.5 mL (5 mg total) by mouth nightly | 1/31/22 | 3/2/22 | | Nasreen Akbar, MD |
| haloperidol (HALDOL) 2 mg/mL solution | Take 2.5 mL (5 mg total) by mouth daily | 2/1/22 | 3/3/22 | | Nasreen Akbar, MD |
| valproic acid (DEPAKENE) 250 MG/5ML solution | Take 10 mL (500 mg total) by mouth every 12 (twelve) hours | 1/31/22 | | | Nasreen Akbar, MD |

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| | |

NYC
HEALTH+
HOSPITALS | **Kings County** | KINGS COUNTY HOSPITAL    Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203    Admit: 1/18/2022, IP: 1/18/2022, Discharge:
1/31/2022

**Significant Event by Prashanth Ramshankar, MD at 01/31/22 2013 (continued)**

MD called his case manager Ms. Loretta - 929-466-2614 and left a voice mail asking for a call back.

Family:

1. Nephew - ▓▓▓▓▓▓▓▓▓▓▓▓ - Writer called and there was no answer and left a voicemail to
call back

2. Daughter - ▓▓▓▓▓▓▓▓▓▓▓▓ - Number is not in use

"Electronically signed by Prashanth Ramshankar, MD at 01/31/22 2016"

**Nursing Note by Donnett Natasha Mitchell, RN at 02/01/22 0048**

| | | |
|---|---|---|
| Author: Donnett Natasha Mitchell, RN | Service: --- | Author Type: Registered Nurse |
| Filed: 02/01/22 0050 | Date of Service: 02/01/22 0048 | Creation Time: 02/01/22 0048 |
| Status: Signed | Editor: Donnett Natasha Mitchell, RN (Registered Nurse) | |

Patient received lying in bed alert, responsive and calm. He denies pain or discomfort. Medication
administered as ordered, no distress was observed. Safety measures are in place, monitoring continues.

"Electronically signed by Donnett Natasha Mitchell, RN at 02/01/22 0050"

**Nursing Note by Donnett Natasha Mitchell, RN at 02/01/22 0541**

| | | |
|---|---|---|
| Author: Donnett Natasha Mitchell, RN | Service: --- | Author Type: Registered Nurse |
| Filed: 02/01/22 0541 | Date of Service: 02/01/22 0541 | Creation Time: 02/01/22 0541 |
| Status: Signed | Editor: Donnett Natasha Mitchell, RN (Registered Nurse) | |

Patient becomes bradycardic when he sleeping. Monitoring continues.

"Electronically signed by Donnett Natasha Mitchell, RN at 02/01/22 0541"

**ED Progress Note by Karen Jeoffroy, MD at 02/01/22 1048**

| | | |
|---|---|---|
| Author: Karen Jeoffroy, MD | Service: Surgical Intensive Care | Author Type: Resident |
| Filed: 02/01/22 1116 | Date of Service: 02/01/22 1048 | Creation Time: 02/01/22 1048 |
| Status: Signed | Editor: Karen Jeoffroy, MD (Resident) | |
| Cosigner: Simon Fitzgerald, MD at 02/01/22 1130 | | |

### Kings County SICU Progress Note

**Name:** Israel Akinsira
**Hospital Day:** 2
**ICU LOS:** 15h

**Overnight Events:**

No acute events overnight
Patient evaluated at bedside by MD in AM

**Hospital Course:**
The patient is a 83 yo m with history of schizoaffective disorder  that was brought to the ED from the inpatient
psych following an altercation. The patient apparently had a verbal altercation with another person which led to
him getting dragged out of bed and getting kicked in the head several times. The patient did have a LOC, and

*ExhiBit 8 B*

**NYC HEALTH HOSPITALS** | **Kings County**    KINGS COUNTY HOSPITAL CENTER    Patient: Akinsira, Israel
451 Clarkson Avenue
BROOKLYN NY 11203    Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

Progress Notes by Kevin Branch, MD at 02/01/22 1708 (continued)
Postop day: * No surgery found *

No acute events overnight.
Repeat CT Head yesterdays stable left SAH, stable SDH, and stable left frontal hematoma
Patient seen and examined, appears baseline with no focal deficits
Denies any pain or headache. Tolerating diet with no nausea/vomiting.
Denies any other injuries.

Interval History:
1/31: 83M level 2 after assault while inpatient

Injuries: SDH, SAH, stable on repeat x1

and psychiatric history of
Schizoaffective disorder and Depression with multiple prior admissions
Edited by: Alec Krosser, MD at 1/31/2022 2238

ROS

Vitals
Temp:  [96.8 °F (36 °C)-99.3 °F (37.4 °C)] 97.7 °F (36.5 °C)
Heart Rate:  [49-76] 72
Resp:  [11-21] 20
SpO2:  [94 %-100 %] 97 %
BP: (105-154)/(51-94) 149/62

I/O

Intake/Output Summary (Last 24 hours) at 2/1/2022 1710
Last data filed at 2/1/2022 1400
            Gross per 24 hour
Intake        2023.33 ml
Output        810 ml
Net          1213.33 ml

Physical Exam
Physical Exam
Constitutional:
  General: He is not in acute distress.
  Appearance: He is not toxic-appearing.
HENT:
  Head:
  Comments: No active bleeding or open wounds noted
Eyes:

Printed on 2/4/22  9:57 AM

EXHIBIT C

NYC
HEALTH+
HOSPITALS | Kings County

KINGS COUNTY HOSPITAL   Patient: Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203      Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

H&P by Alec Krosser, MD at 01/31/22 1901 (continued)

- Schizoaffective disorder (HCC)                              12/5/2019

**Past Surgical History:**
Procedure                                    Laterality      Date
- CYSTOSCOPY
- TRANSURETHRAL RESECTION OF PROSTATE

Past Trauma History:  Past Trauma History:  denies
Last Meal: lunch

ROS
Constitutional: Negative.  Negative for activity change, appetite change, chills, diaphoresis, fatigue, fever and unexpected weight change.
HENT: Positive. Eye echymossis, dried blood. a
Respiratory: Negative.  Negative for chest tightness and shortness of breath.
Cardiovascular: Negative.  Negative for chest pain and leg swelling.
Gastrointestinal: Negative.  Negative for abdominal distention, abdominal pain, anal bleeding, blood in stool, constipation, diarrhea, nausea, rectal pain and vomiting.
Genitourinary: Negative.  Negative for dysuria and hematuria.
Musculoskeletal: Negative.
Neurological: Negative.

Vitals:
|            | 01/31/22 1716      | 01/31/22 1737 |
|------------|--------------------|---------------|
| BP:        | (!) 148/77         |               |
| Patient Position: | Lying       |               |
| Pulse:     | 65                 |               |
| Resp:      | 18                 |               |
| Temp:      | 97.6 °F (36.4 °C)  |               |
| TempSrc:   | Axillary           |               |
| SpO2:      | 100%               | 100%          |

Exhibit B D

NYC
HEALTH+
HOSPITALS | Kings County

KINGS COUNTY HOSPITAL    Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203          Admit: 1/31/2022, IP: 1/31/2022, Discharge:

Transfer of Care by Mohamed Diane, MD at 01/31/22 2000 (continued)
fissure measuring approximately 6 mm. No significant
mass effect or midline shift.
2.  Left frontal soft tissue swelling without underlying
calvarial fracture.
3.  Calcification of the bilateral external ear cartilage is
nonspecific, correlate for metabolic abnormalities.
4.  Global atrophy and chronic microvascular
ischemia, which has progressed slightly compared to
the prior study.

The above findings were discussed with Dr. Gendy of
the trauma team on 1/31/2022 5:46 PM with
confirmation.

END OF RESIDENT PRELIMINARY REPORT
NOT REVIEWED BY ATTENDING RADIOLOGIST.

Radiology Attending Physician Final Review:
CT HEAD WO CONTRAST

I, Zeshan Chaudhry, MD, have personally reviewed
the images and interpretation as stated and signed
above and wish to modify the preliminary report in the
following manner. The below now represents the
FINAL REPORT for this patient.

Correction to the above, left sylvian fissure
hyperdensity consistent with a small volume of
subarachnoid hemorrhage, not intraventricular. No
evidence of acute intraventricular hemorrhage.
Additionally there is thin subdural hemorrhage along
the right
tentorial leaflet and in the interhemispheric fissure.
This measures approximately 1.5 mm in thickness.

Encephalomalacia of the left inferolateral frontal lobe
and the left anterior temporal pole, as well as minimal
encephalomalacia of the right inferomedial frontal
lobe. These findings are most consistent with the
sequelae of previous traumatic brain
injury, also visible on the remote prior MRI of
December 21, 2015.

Diffuse enlargement of the lateral and third ventricles,
slightly out of proportion to the degree of sulcal
prominence, similar to the most recent prior exam.

Near complete opacification of a right posterior
ethmoidal air cell. Otherwise the visualized paranasal
sinuses are well aerated.

EXHIBIT E

NYC
HEALTH
HOSPITALS | Kings County | KINGS COUNTY HOSPITAL    Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203        Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

## Imaging - Radiology Results (continued)

Resulted: 01/31/22 1812, Result status: Final
__CT Head without contrast [343867947] (continued)__                                    result

Parenchyma: There is no evidence for mass effect, acute intracranial hemorrhage, or large territory infarction. Periventricular, deep white matter, and subcortical hypodensities suggestive of chronic microvascular ischemia.

Ventricles and extra-axial spaces: Focus of high attenuation material is seen in the left sylvian fissure measuring approximately 6 mm. Diffuse prominence of the ventricular system and cortical sulci consistent with global atrophy.

Paranasal sinuses and mastoid air cells: Mild mucosal thickening in the left paranasal sinuses.

Bones: Unremarkable. No acute fracture, however evaluation is limited by patient motion.

Additional comment: Scattered vascular atherosclerotic calcifications. Left frontal and right occipital soft tissue swelling. Calcifications of the bilateral external ear cartilage.


Impression:
IMPRESSION:

1. Intraventricular hemorrhage in the left sylvian fissure measuring approximately 6 mm. No significant mass effect or midline shift.
2. Left frontal soft tissue swelling without underlying calvarial fracture.
3. Calcification of the bilateral external ear cartilage is nonspecific, correlate for metabolic abnormalities.
4. Global atrophy and chronic microvascular ischemia, which has progressed slightly compared to the prior study.

The above findings were discussed with Dr. Gendy of the trauma team on 1/31/2022 5:46 PM with confirmation.

END OF RESIDENT PRELIMINARY REPORT
NOT REVIEWED BY ATTENDING RADIOLOGIST.


Radiology Attending Physician Final Review:
CT HEAD WO CONTRAST

I, Zeshan Chaudhry, MD, have personally reviewed the images and interpretation as stated and signed above and wish to modify the preliminary report in the following manner. The below now represents the FINAL REPORT for this patient.

Correction to the above, left sylvian fissure hyperdensity consistent with a small volume of subarachnoid hemorrhage, not intraventricular. No evidence of acute intraventricular hemorrhage. Additionally there is thin subdural hemorrhage along the right tentorial leaflet and in the interhemispheric fissure. This measures approximately 1.5 mm in thickness.

Encephalomalacia of the left inferolateral frontal lobe and the left anterior temporal pole, as well as minimal encephalomalacia of the right inferomedial frontal lobe. These findings are most consistent with the sequelae of previous traumatic brain injury, also visible on the remote prior MRI of December 21, 2015.

Diffuse enlargement of the lateral and third ventricles, slightly out of proportion to the degree of sulcal prominence, similar to the most recent prior exam.

Near complete opacification of a right posterior ethmoidal air cell. Otherwise the visualized paranasal sinuses are well aerated.

Exhibit 8 f

NYC
HEALTH+
HOSPITALS | **Kings County**  KINGS COUNTY HOSPITAL  Patient: Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203   Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

Progress Notes by Eric Windsor, MD at 02/03/22 1125 (continued)

FINDINGS: There is new slight hypodense prominence of the extra-axial spaces bifrontally measuring approximately 3 mm in thickness suggestive of subdural hygromas.

Previously identified trace subarachnoid hemorrhage in the left sylvian fissure has resolved.

Previously identified trace posterior parafalcine and right tentorial subdural hemorrhage has resolved.

Redemonstrated areas of encephalomalacia involving the basal left frontal lobe and anterior/inferior left temporal lobe adjacent to the greater sphenoid wing and a small area along the anterior right gyrus rectus.

Generalized cerebral atrophy.

Redemonstrated prominence of the ventricular system somewhat out of proportion of the sulci.

Patchy hypodensity is again seen within the deep comparison white matter compatible with a background of mild chronic microvascular ischemic change.

No new or acute intracranial hemorrhage is seen.

No mass effect, midline shift or evidence of an acute ischemic infarct.

No acute fracture the calvarium or visualized skull base. The visualized mastoid air cells and orbits are unremarkable. Mild inflammatory changes in scattered paranasal sinuses, most notably in the right posterior ethmoid air cells with thickening of the
sinus walls due to chronic inflammatory change.

Scalp contusions, significantly decreased in the left frontotemporal region and stable in the right occipital region.

Impression
IMPRESSION:

1. New slight prominence of the extra-axial spaces bifrontally suggestive of small subdural hygromas.
2. Resolution of previously identified trace left sylvian fissure subarachnoid hemorrhage and trace para false seen and tentorial subdural hemorrhage.
2. Redemonstrated prominence of the ventricular system out of proportion of the sulci suggestive of mild chronic communicating hydrocephalus.
3. Cerebral atrophy, chronic microvascular ischemic changes and lateral frontal and left temporal encephalomalacia suggestive of remote brain contusions.

Final report dictated by   and signed by Vinodkumar Velayudhan 2/2/2022 1:14 PM

Tubes/Drains:
Peripheral IV Unknown Anterior;Right Forearm (Active)
*No placement date or time found. Placement Date: Unknown Size (Gauge): 20 G Orientation:
Anterior;Right Location: Forearm
Number of days:*

Peripheral IV Unknown Anterior;Left;Proximal Forearm (Active)

NYC
HEALTH+
HOSPITALS | Kings County

KINGS COUNTY HOSPITAL  Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203          Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

**H&P by Alec Krosser, MD at 01/31/22 1901 (continued)**
significant mass effect or midline shift. 2.  Left frontal soft tissue swelling without underlying calvarial fracture.
3.  Calcification of the bilateral external ear cartilage is nonspecific, correlate for metabolic abnormalities. 4.
Global atrophy and chronic microvascular ischemia, which has progressed slightly compared to the prior study.
The above findings were discussed with Dr. Gendy of the trauma team on 1/31/2022 5:46 PM with
confirmation. END OF RESIDENT PRELIMINARY REPORT NOT REVIEWED BY ATTENDING
RADIOLOGIST. Radiology Attending Physician Final Review: CT HEAD WO CONTRAST I, Zeshan Chaudhry,
MD, have personally reviewed the images and signed above and wish to modify
the preliminary report in the following manner. The below now represents the FINAL REPORT for this patient.
Correction to the above, left sylvian fissure hyperdensity consistent with a small volume of subarachnoid
hemorrhage, not intraventricular. No evidence of acute intraventricular hemorrhage. Additionally there is thin
subdural hemorrhage along the right tentorial leaflet and in the interhemispheric fissure. This measures
approximately 1.5 mm in thickness. Encephalomalacia of the left inferolateral frontal lobe and the left anterior
temporal pole, as well as minimal encephalomalacia of the right inferomedial frontal lobe. These findings are
most consistent with the sequelae of previous traumatic brain injury, also visible on the remote prior MRI of
December 21, 2015. Diffuse enlargement of the lateral and third ventricles, slightly out of proportion to the
degree of sulcal prominence, similar to the most recent prior exam. Near complete opacification of a right
posterior ethmoidal air cell. Otherwise the visualized paranasal sinuses are well aerated. Final report dictated
by Ruby Vassar and signed by Zeshan Chaudhry 1/31/2022 6:12 PM

CT Cervical Spine without contrast

Result Date: 1/31/2022
IMPRESSION: 1.  No acute fracture of the cervical spine. 2.  Multilevel chronic degenerative changes of the
cervical spine as detailed above. 3.  Bubbly secretions seen within the esophagus, which may represent an
aspiration risk. END OF RESIDENT PRELIMINARY REPORT PLEASE SEE BELOW FOR ATTENDING
FINAL REVIEW Attending Concur: CT CERVICAL SPINE WO CONTRAST I, Zeshan Chaudhry, MD, have
personally reviewed the images and concur with the preliminary report and the interpretation as stated and
signed above. This report now represents the FINAL REPORT for this patient. Final report dictated by Ruby
Vassar and signed by Zeshan Chaudhry 1/31/2022 6:33 PM

DX Pelvis 1 View

Result Date: 1/31/2022
IMPRESSION: No acute osseous injury. END OF RESIDENT PRELIMINARY REPORT:  THIS REPORT HAS
NOT YET BEEN VERIFIED BY AN ATTENDING RADIOLOGIST. PLEASE SEE BELOW FOR ATTENDING
FINAL REVIEW. _____ Attending Concur:
DX PELVIS 1 VIEW I, Zeshan Chaudhry, MD, have personally reviewed the images and concur with the
preliminary report and the interpretation as stated and signed above. This report now represents the FINAL
REPORT for this patient. Final report dictated by John Denning and signed by Zeshan Chaudhry 1/31/2022
6:00 PM

DX Portable Chest 1 View

Result Date: 1/31/2022
IMPRESSION: No evidence of acute fracture or pneumothorax. Cardiac silhouette within normal limits. No
evidence of consolidation or pleural effusion. Final report dictated by   and signed by Delan Dealwis 1/31/2022
5:45 PM

**Pending Studies:** repeat CTH, labs

EXhiBiT8G

| NYC HEALTH HOSPITALS | Kings County | KINGS COUNTY HOSPITAL CENTER 451 Clarkson Avenue BROOKLYN NY 11203 | Patient:Akinsira, Israel |
|---|---|---|---|

Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

**H&P by Alec Krosser, MD at 01/31/22 1901 (continued)**

| | | |
|---|---|---|
| BUN | 16.0 | 01/18/2022 |
| CREAT, URINE (DAU) | >25 | 01/20/2022 |
| CREATININE | 1.02 | 01/18/2022 |

**Coagulation:**
**ABGs:**
**Lab Results**

| Component | Value | Date |
|---|---|---|
| PH UA | 5.5 | 01/20/2022 |
| PHURINE | 5.7 | 01/20/2022 |

**Magnesium Level:**
**Hepatic Profile:**
**Lab Results**

| Component | Value | Date |
|---|---|---|
| ASTSGOT | 31 | 01/18/2022 |
| ALTSGPT | 36 | 01/18/2022 |
| TOTALBILIRUBIN | 0.5 | 01/18/2022 |
| ALBUMIN | 4.1 | 01/18/2022 |

**Toxicology:**
**Urinalysis:**
**Lab Results**

| Component | Value | Date |
|---|---|---|
| BILIRUBIN UA | Negative | 01/20/2022 |
| BLOOD UA | Negative | 01/20/2022 |
| KETONES UA | Negative | 01/20/2022 |
| NITRITE UA | Negative | 01/20/2022 |
| PHURINE | 5.7 | 01/20/2022 |
| PROTEIN UA | Negative | 01/20/2022 |
| UROBILINOGEN UA | 0.2 | 01/20/2022 |

**Venous Blood Gas:**

Invalid input(s): GLUSER

.micr

**Radiology:**
CT Head without contrast

Result Date: 1/31/2022
IMPRESSION: 1.  Intraventricular hemorrhage in the left sylvian fissure measuring approximately 6 mm. No

NYC
HEALTH+
HOSPITALS | **Kings County** KINGS COUNTY HOSPITAL   Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203          Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

H&P by Alec Krosser, MD at 01/31/22 1901 (continued)

Physical Exam
Gen: patient is in no distress
Neuro: AAOx3, CN II-XII intact bilaterally, motor and sensory intact bilaterally
HEENT: R eye echymossis, dried blood. Dried blood around mouth and in mouth, no active bleeding seen from either
Neck: C spine without midline tenderness. No step-off or deformity. C collar was placed prior and kept in place for mechanism until imaging can be obtained
Chest: breath sounds equal bilaterally and equal chest rise bilateral. No chest wall crepitus, subcutaneous emphysema, nontender to palpation
Abd: soft, nontender, nondistended, pelvis stable
Back: T and L spine without midline tenderness. No step-off or deformity
Genitourinary: normal appearing external genitalia, no blood present
Axilla: no lacerations or penetrating trauma to bilateral axilla
Perineum: No blood in perineum
Upper extremities: 2+ radial pulse bilaterally, motor and strength intact bilaterally. No gross deformity
Lower extremities: 2+ femoral, DP, and PT pulse bilaterally, motor and strength intact bilaterally. No gross deformity
Skin: no lacerations or abrasions other than noted above                               *intact*

**Chest X-ray:** Normal.
**PELVIC XR:** normal
**EFAST:** negative

**ED Procedures:** FAST
**Labs:**
CBC:
Lab Results

| Component | Value | Date |
|---|---|---|
| WBC | 4.43 (L) | 01/18/2022 |
| WBC UA | 0-5 | 01/20/2022 |
| RBC | 4.17 (L) | 01/18/2022 |
| RBC UA | 0-5 | 01/20/2022 |
| MCV | 85.6 | 01/18/2022 |
| MCH | 27.3 | 01/18/2022 |
| MCHC | 31.9 | 01/18/2022 |
| PLATELET COUNT | 162 | 01/18/2022 |
| RDW | 14.3 | 01/18/2022 |
| MPV | 12.4 (H) | 01/18/2022 |
| HGB | 11.4 (L) | 01/18/2022 |
| HGBA1C | 4.7 | 01/18/2022 |

BMP:
Lab Results

| Component | Value | Date |
|---|---|---|
| GLUCOSE | 108 (H) | 01/18/2022 |
| GLUCOSE QUALITATIVE UA | Negative | 01/20/2022 |
| SODIUM | 138 | 01/18/2022 |
| POTASSIUM | 4.2 | 01/18/2022 |
| CHLORIDE | 101 | 01/18/2022 |
| CO2 | 26 | 01/18/2022 |

EXHIBIT 8J

NYC HEALTH+HOSPITALS | **Kings County** | KINGS COUNTY HOSPITAL CENTER
451 Clarkson Avenue
BROOKLYN NY 11203 | Patient:Akinsira, Israel

Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

H&P by Alec Krosser, MD at 01/31/22 1901 (continued)



- Schizoaffective disorder (HCC)                                        12/5/2019

**Past Surgical History:**
Procedure                                                 Laterality        Date
- CYSTOSCOPY
- TRANSURETHRAL RESECTION OF PROSTATE

**Past Trauma History:** Past Trauma History: denies
**Last Meal:** lunch

**ROS**
Constitutional: Negative. Negative for activity change, appetite change, chills, diaphoresis, fatigue, fever and unexpected weight change.
HENT: Positive. Eye echymossis, dried blood.
Respiratory: Negative. Negative for chest tightness and shortness of breath.
Cardiovascular: Negative. Negative for chest pain and leg swelling.
Gastrointestinal: Negative. Negative for abdominal distention, abdominal pain, anal bleeding, blood in stool, constipation, diarrhea, nausea, rectal pain and vomiting.
Genitourinary: Negative. Negative for dysuria and hematuria.
Musculoskeletal: Negative.
Neurological: Negative.

**Vitals:**

|  | 01/31/22 1716 | 01/31/22 1737 |
|---|---|---|
| BP: | (!) 148/77 |  |
| Patient Position: | Lying |  |
| Pulse: | 65 |  |
| Resp: | 18 |  |
| Temp: | 97.6 °F (36.4 °C) |  |
| TempSrc: | Axillary |  |
| SpO2: | 100% | 100% |

NYC
HEALTH+
HOSPITALS | Kings County

KINGS COUNTY HOSPITAL    Patient: Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203    Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

**H&P by Alec Krosser, MD at 01/31/22 1901 (continued)**

Physical Exam
Gen: patient is in no distress
Neuro: AAOx3, CN II-XII intact bilaterally, motor and sensory intact bilaterally
HEENT: R eye echymossis, dried blood. Dried blood around mouth and in mouth, no active bleeding seen from either
Neck: C spine without midline tenderness. No step-off or deformity. C collar was placed prior and kept in place for mechanism until imaging can be obtained
Chest: breath sounds equal bilaterally and equal chest rise bilateral. No chest wall crepitus, subcutaneous emphysema, nontender to palpation
Abd: soft, nontender, nondistended, pelvis stable
Back: T and L spine without midline tenderness. No step-off or deformity
Genitourinary: normal appearing external genitalia, no blood present
Axilla: no lacerations or penetrating trauma to bilateral axilla
Perineum: No blood in perineum
Upper extremities: 2+ radial pulse bilaterally, motor and strength intact bilaterally. No gross deformity
Lower extremities: 2+ femoral, DP, and PT pulse bilaterally, motor and strength intact bilaterally. No gross deformity
Skin: no lacerations or abrasions other than noted above

*INFACT*

**Chest X-ray: Normal.**
**PELVIC XR: normal**
**EFAST: negative**

**ED Procedures: FAST**
**Labs:**
CBC:
Lab Results

| Component | Value | Date |
|---|---|---|
| WBC | 4.43 (L) | 01/18/2022 |
| WBC UA | 0-5 | 01/20/2022 |
| RBC | 4.17 (L) | 01/18/2022 |
| RBC UA | 0-5 | 01/20/2022 |
| MCV | 85.6 | 01/18/2022 |
| MCH | 27.3 | 01/18/2022 |
| MCHC | 31.9 | 01/18/2022 |
| PLATELET COUNT | 162 | 01/18/2022 |
| RDW | 14.3 | 01/18/2022 |
| MPV | 12.4 (H) | 01/18/2022 |
| HGB | 11.4 (L) | 01/18/2022 |
| HGBA1C | 4.7 | 01/18/2022 |

BMP:
Lab Results

| Component | Value | Date |
|---|---|---|
| GLUCOSE | 108 (H) | 01/18/2022 |
| GLUCOSE QUALITATIVE UA | Negative | 01/20/2022 |
| SODIUM | 138 | 01/18/2022 |
| POTASSIUM | 4.2 | 01/18/2022 |
| CHLORIDE | 101 | 01/18/2022 |
| CO2 | 26 | 01/18/2022 |

*EXHIBIT J*

NYC
HEALTH+
HOSPITALS | Kings County

KINGS COUNTY HOSPITAL  Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203          Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

## RESULTS (continued)

· Sedative frequency Denies

Other Abuse History

**Substance Withdrawal Symptoms**

ALLERGIES:
No Known Allergies

MENTAL STATUS EXAM:
Mental Status
  Most Recent Value
Mental Status
Appearance  Well-groomed, Good eye contact
Appearance Remarks: Appears stated age, well-nourished,
well-developed, good eye contact, smiling
Behavior WNL
Behavior Remarks: Calm, cooperative, pleasant
Attention Alert
Attitude Cooperative
Speech Remarks: Slightly slurred at times but intelligible,
normal rate, rhythm, tone,  hyperverbal but not pressured
Mood Euthymic
Affect Appropriate, Reactive
Thought pattern/process remarks: Tangential at times but able to
hold conversation with some redirection
Thought Content Religious preoccupation
Suicidal Ideation None
Homicidal Ideation None
Delusions Grandiose
Delusions Remarks: believes grandmother was queen and died at 130
giving him 'good genes'
Perception Unimpaired
Hallucinations None
Orientation To Time: Yes, Place: Yes, Person: Yes
Concentration Good
Memory Unimpaired
Memory Remarks: memory not formally tested but knows medication
he takes "risperidone 2mg",  knows exact date he moved to US
"April 14 2001"
Ability to Abstract Fair
Intellectual Functioning Average
Insight 1 - Moderate
Judgement Fair
Impulse Control Good

VITAL SIGNS:
Temp:  [97 °F (36.1 °C)-99.9 °F (37.7 °C)] 97.7 °F (36.5 °C)
Heart Rate:  [51-72] 61
Resp:  [11-24] 16
SpO2:  [96 %-100 %] 99 %
BP: (104-149)/(50-93) 142/73

NYC
HEALTH
HOSPITALS | **Kings County** | KINGS COUNTY HOSPITAL    Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203    Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

Consults by Elizabeth Zharovsky, MD at 02/02/22 1437 (continued)

decompensated. During course of hospitalization, patient was initially changed from his home regimen of risperdal to Invega in order to help with compliance. He was optimized to 6 mg and could not be given a higher dose due to age and renal insufficiency, however remained agitated with mood lability and psychosis. He was crosstapered to Haldol which was changed to 5 mg twice a day given he has had multiple restraint episodes and episodes of agitation with some response to haldol and ativan. HE then began refusing all medications. Depakote was continued but patient had been refusing that as well. Patient cotinued to have episodes of mood lability. And remained psychotic and at times aggressive. Neuropsychiatry evaluated patient however evaluation was limited given patient ended up in restraints again that day but recommended repeat of labs for Lyme disease which was done on 1/25/22 and found to be negative and patient was also placed on b12 supplementation. He has been refusing all scheduled medications for the last several days, however has been consistently receiving prn doses of Haldol and ativan almost daily.

Earlier today, patient was in a verbal altercation with another peer this morning, requiring Intramuscular Haldol and Ativan to help with agitation. Later in day, per patient comment, patient was laying in bed, when another peer came into his room, grabbed him off of the bed and threw patient on floor and repeatedly kicked him in the head. However per PCT who witnessed event, patient was not in bed but was coming out of the bathroom when the peer in question entered and got patient onto the floor began hitting him repeatedly and kicking him in the head and also stepping on his head. Patient was initially unconscious, bleeding from mouth and possibly also head, and incontinent of urine. Patient maintained a pulse, code 66 and code orange were called. Patient after a few moments regained consciousness was alert and oriented to self and place, able to move all limbs and pupils were reactive bilaterally. Vital signs were acceptable. Patient's c spine was stabilized and then patient was transferred to CCT for further workup."

Past Psych History:

| History | Date | Comments |
|---|---|---|
| Depression | | |
| Schizoaffective disorder (HCC) | 12/5/2019 | |



Exhibit 2

NYC
HEALTH+
HOSPITALS | Kings County CENTER

KINGS COUNTY HOSPITAL · Patient:Akinsira, Israel
451 Clarkson Avenue
BROOKLYN NY 11203

Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

**Consults by Alec Krosser, MD at 01/31/22 1737 (continued)**
- nsgy consult and follow nsgy recs
- NCC consult
- repeat CTH timing per nsgy
- elevate HOB
- monitor BP
- neuro checks

**Trauma**
S/p assault
- geriatric trauma, will get geriatrics consult

Disposition: SICU
**Patient seen and examined with Attending Dr.Boudourakis**

Alec Krosser, MD

"Electronically signed by Leon Boudourakis, MD at 02/01/22 0238"

**Nursing Note by Alicia Wilson, RN at 01/31/22 1752**

| Author: Alicia Wilson, RN | Service: — | Author Type: Registered Nurse |
|---|---|---|
| Filed: 01/31/22 1825 | Date of Service: 01/31/22 1752 | Creation Time: 01/31/22 1752 |
| Status: Addendum | Editor: Alicia Wilson, RN (Registered Nurse) | |

Related Notes: Original Note by Alicia Wilson, RN (Registered Nurse) filed at 01/31/22 1822

At about 1640 peer AA went into patient's room. The PCT reported that the patient was leaving the bathroom when peer punched him until he fell to the ground. He continued to punch him then stomped on his head about three times. Code orange was activated at 1640. Staff immediately intervened, shouting at patient to stop. Peer AA then walked out of the room. Patient was initially unconscious. There was visible swelling to the left side of the head, bleeding from his mouth. Patient maintained a pulse. Code 66 was called at 1640. Code team arrived at 1645. BP taken at 1644 170/82 P64, BP taken at 1649 155/71 P69, BP taken at 1655 151/81 P70. Patient was incontinent of urine. During assessment by rapid response team patient was able to respond to simple questions. He was observed moving all limbs. IV was placed to left forearm, 20 gauge. Patient was transferred to medical via stretcher accompanied by code team, HN and PCT for further assessment and work up at 1705.

"Electronically signed by Alicia Wilson, RN at 01/31/22 1825"

**ED Provider Notes by Monisha Dilip, MD at 01/31/22 1805**

| Author: Monisha Dilip, MD | Service: Emergency Dept | Author Type: Resident |
|---|---|---|
| Filed: 02/01/22 0005 | Date of Service: 01/31/22 1805 | Creation Time: 01/31/22 1805 |
| Status: Attested | Editor: Monisha Dilip, MD (Resident) | |
| Cosigner: James Hassel, MD at 02/01/22 0050 | | |
| Attestation signed by James Hassel, MD at 02/01/22 0050 | | |

Review/Sign-off - resident's documentation w/ revisions:  I have personally seen, evaluated and participated in this patient's care and find this patient's history and physical examination are consistent with the resident's documentation with the following exceptions/revisions.   *corrections*

*1;06*

83M PMH as listed below here after being assaulted as an inpatient in the R building, head slammed into the wall and then stomped on repeatedly as reported by Dr. Umeozor. Pt had LOC there, here GCS 13 (-1 for eyes and speech) with L temporal hematoma and not able to maintain alertness during interview.  Patient

*Exhibit M*

NYC
HEALTH+
HOSPITALS **Kings County** KINGS COUNTY HOSPITAL  Patient:Akinsira, Israel
CENTER
451 Clarkson Avenue
BROOKLYN NY 11203      Admit: 1/31/2022, IP: 1/31/2022, Discharge: —

Consults by Alec Krosser, MD at 01/31/22 1737 (continued)

- Schizoaffective disorder (HCC)                                     12/5/2019
                                                                    12/5/2019
                                                                    12/5/2019

                                                                    12/5/2019

**Past Surgical History:**
Procedure                                    Laterality        Date
- CYSTOSCOPY
- TRANSURETHRAL RESECTION OF PROSTATE

Past Trauma History:  denies
Last Meal: lunch

**Primary Survey:**
A: Airway intact. Patient speaking in full complete sentences
B: Bilateral breath sounds on auscultation without tachypnea
C: 2+ Radial, Ulnar, Carotid, Femoral, Popliteal, Dorsalis Pedis, Posterior Tibial pulses bilaterally. Warm well perfused skin.
D: E: 3 - To Speech, V: 5 - Oriented; M: 6 - Obeys commands = 14
PERRLA, Moves all 4 extremities
E: fully exposed

Vitals:
                    01/31/22 1716              01/31/22 1737
BP:                 (!) 148/77
Patient             Lying
Position:
Pulse:              65
Resp:               18
Temp:               97.6 °F (36.4 °C)
TempSrc:            Axillary
SpO2:               100%                        100%

**Secondary survey :**

Physical Exam
Gen: patient is in no distress
Neuro: AAOx3, CN II-XII intact bilaterally, motor and sensory intact bilaterally
HEENT: R eye echymossis, dried blood. Dried blood around mouth and in mouth, no active bleeding seen from either
Neck: C spine without midline tenderness. No step-off or deformity. C collar was placed prior and kept in place for mechanism until imaging can be obtained
Chest: breath sounds equal bilaterally and equal chest rise bilateral. No chest wall crepitus, subcutaneous emphysema, nontender to palpation
Abd: soft, nontender, nondistended, pelvis stable
Back: T and L spine without midline tenderness. No step-off or deformity
Genitourinary: normal appearing external genitalia, no blood present
Axilla: no lacerations or penetrating trauma to bilateral axilla
Perineum: No blood in perineum

Printed on 2/4/22  9:57 AM                              Page  3

7044622 EXHIBITS I TO XI

Policies, laws, cases, NYRCC, correction Law,
Mental Health Law, that All corraberate

EXhiBits to show false Arrest occurred
EXhiBit I: 911 call from Office of Mental health
never followed procedures or policies
EXhiBit II: Autonomous entity with its own policies
EXhiBit III: (OmH) policy manual on fights and
restraints, seclusion and closed wards to violence
EXhiBit IV: supplay mental manual which corrabe-
rates OmH policy manual and coincides with law.
EXhiBit V: case from kings county court she pardize
(never policy to indict of assaults and fights common place)
EXhiBit VI: 14 NYCRR 27.2 (New York codes Rules
& Regulation for government say "restraints are
a last resort to the last or danger to life or limb"
that corraberates "OmH policy manual see Ex III"
which corraberates "mental hygiene Law 33.4" and
"state administrative Procedure Act 102(a)" & NY const IV &
EXhiBit VII: violence, escape go to "closed wards"
EXhiBit VIII: case of individuals in a violent Altercation
was restrained to Bed with Bed sheets, one escaped
and attacked again permantley Blind, fractured nose
was separated
EXhiBit IX: Different Laws and cases of closed wards
EXhiBit X: APA about assaults and fights happen
EXhiBit XI: case of another closed ward
OmH, APA, and nami policies are never
to arrests violation of The Equal protection Clause

# Event Chronology -- D22013115068

## Summary

| Event Number/Type | Location | Event Times |
|---|---|---|
| D22013115068<br>34Q1 (ASSAULT (IN PROGRESS): OTHER/INSIDE) | 681 CLARKSON AVE BK,14:3 FLR<br>TROY AVE / E 45 ST | Started 01/31/22 16:35:40<br>Created 01/31/22 16:38:14<br>First Dispatch 01/31/22 16:40:23<br>First Arrive 01/31/22 16:49:42 |

| First Call | Assigned Units | Cross-References | Dispositions |
|---|---|---|---|
| NEW YORK STATE OFFICE OF MENTAL<br><br>681 CLARKSON AVE BK: BLDG 2 FLR BSM<br>Call Count 1 | 71A2-3<br>71ST1-3<br>71C1-3 | | A22013115068<br>CANCELEV<br>D22013115068 91, 95<br>N22013115068<br>CANCELEV |

☑Include System Comments          ☐Include Associated Events

## Report

**Total records returned: 80**

| Date/Time | Operator | Terminal | Details |
|---|---|---|---|
| 01/31/22 16:35:40 | 372764 | ps1-c022 | ANI/ALI Number: 155386123<br>Caller Name: NEW YORK STATE OFFICE OF MENTAL<br>Caller Phone: ▮▮▮▮▮<br>Location: 681 CLARKSON AVE BROOKLYN<br>Telco Comment: : BLDG 2 FLR BSM<br>Company: VERIZ<br>Service Class: PBXb |
| 01/31/22 16:38:14 | 372764 | ps1-c022 | D event D22013115068 created<br>at 681 CLARKSON AVE BK,14:3 FLR<br>Cross Street TROY AVE<br>Cross Street E 45 ST<br>Name: NEW YORK STATE OFFICE OF MENTAL<br>Address: 681 CLARKSON AVE BK: BLDG 2 FLR BSM<br>Call Source: ANI/ALI<br>Phone Number: ▮▮▮▮▮<br>Zone: Z20 |

*ExhiBit3 I*

# EXHIBITS ☐ to ☒

Out rageous Governmental and Prosecutorial misconduct, impeachment with hyperbole, exculpatory evidence witheld and Definitions

Exhibits prove falo Arrest, Due process, violations, hiding evidence, falsus Omnibus, fraud and impeachment of states witnesses plus definitions

Exhibit ☐: 5 decades of D.A. and Judges That use to work for D.A. prosecutorial misconduct, hiding important information of deception of police officers for 50 years falsifying documents, evidence and statements and still convict knowing this

Exhibit A: Another one of DA.'s lies and const. violations They said I was arreigned on 02-03-22 and my 180.80 and 190.50 day was the next day 02-04-22 and lied they have a form (which they should have video's from camcorder, Body cam, and c.tv surveillance) which they don't and they didn't afford him Rosario material in one day which is no time to prepare People v Davis which is all lies

Exhibit ☐: is from J-o-c intake process showing I entered the Island from court 02-04-22 arroingment step 1 intro of intake to Emtc and covid test and questions coming in which shows the OA lied in Exhibit A Fraud

Exhibit A: hiding video even though you was alerted early 02-07-22 and you refuse to show the truth

Exhibit O: lies about Homeless, drug addict By Ramshanker (utox neg

Exhibit ☐: more lies and injuries multiple scelrosis, steonosis, corvasis sciatic Nerves, Eaulirrum craintomy so how could I stand and kick me and Mr Antricina has a similiar problem "we are fall risk"

Exhibit ☐: more lies about Drugs and Hospitalizations

medical definitions    no injury

NEWS (/NEWS)

# Exclusive: Brooklyn DA Releases Secret Lists Of Cops They Don't Trust

BY GEORGE JOSEPH (/STAFF/GEORGE-JOSEPH)

PUBLISHED NOVEMBER 6, 2019 |

84 COMMENTS (/NEWS/EXCLUSIVE-BROOKLYN-DA-RELEASES-SECRET-LISTS-COPS-THEY-DONT-
TRUST#COMMENTS)





Mayor Bill de Blasio delivers remarks at an NYPD graduation at Madison Square Garden in 2017.
ED REED/MAYORAL PHOTOGRAPHY OFFICE

EXHiBiT 8

substance, that defendant was going to get the hospital staff next. The CW suffered extensive injuries including lacerations about the face, swelling about the head, bleeding about the mouth, brain hemorrhages, and loss of consciousness.

4.    On January 31, 2022, at approximately 4:09 p.m., the defendant was arrested and charged, by Kings County Docket CR-002685-22KN, with two counts of Assault in the Second Degree (P.L. §120.05[1]), among other charges.

5.    On February 3, 2022, at defendant's arraignment in Part APAR1 of the New York City Criminal Court for Kings County, People served upon defendant, amongst other notices, written notice in accordance with C.P.L. § 190.50 indicating the People's intention to present the case before the Grand Jury and seek an indictment.

6.    At that time, defense counsel, Reda Woodcock, served cross notice pursuant to CPL § 190.50 of defendant's intention to testify in the Grand Jury.

7.    On February 3, 2022, the People served and filed an Order to Produce for the defendant to appear to testify in the Grand Jury for February 4, 2022. The Order to Produce was signed and sent to the Department of Corrections.

8.    On February 4, 2022, the scheduled 180.80 date, the defendant refused to board the Department of Corrections bus to appear in Supreme Court for defendant's scheduled appearance in AP1F. The refusal was memorialized in the City of New York Undelivered Defendant form.

9.    On February 4, 2022, the People presented charges to the Grand Jury as to the defendant and the Grand Jury returned an indictment against the defendant as to the charge of Assault in the Second Degree, among other charges, under Indictment Number 70448/2022.



2

# NYC HEALTH+ HOSPITALS | Correctional Health Services

| | |
|---|---|
| **Patient Name:** | **Latest Book and Case#:** |
| ANDRE   ANTROBUS | 1412200303 |
| **NYSID:** | **Patient Facility:** |
| 05009121Z | EMTC |

## *SUBJECTIVE*
### INT - Step 1 - Intake Intro

Patient: **ANDRE ANTROBUS**   DOB: **04/25/1965**   Age: **56 Years Old**
Book & Case #: **1412200303**   NYSID: **05009121Z**
Facility: **EMTC**   Housing Area: **RR**
Form filled out by: **Beverley Arnold Staff Nurs, February   4, 2022 4:50 PM**

### COVID-19 POC Test

Patient Demographics (from IIS) - for confirmation
Patient Address: **158 N10TH STREET, 1**
City: **BROOKLYN**
Gender Identity: **Male**
Gender pronouns: **he-him-his**

Begin Intake
Accepting intake process? **YES**
*Identify a community pharmacy where outpatient prescriptions may be sent upon discharge:*Acknowledged
Type of Medical Intake? **Adult Male**

## *HISTORY*
### INT - Step 1 - Adult Male Intake

Patient: **ANDRE ANTROBUS**   DOB: **04/25/1965**   Age: **56 Years Old**
Book & Case #: **1412200303**   NYSID: **05009121Z**
Facility: **EMTC**   Housing Area: **RR**
Language / Living Situation:
Comfortable with English?    **YES**
Military service? **YES**
Where living now? **Private home**

Community Medication Fill History
Results: **None Found**
Meds taking now: Patient states that he take percocet but they took it from him, also states he has asthma and he uses albuterol

Allergies
Previously documented allergies:
IBUPROFEN (Critical)
NAPROSYN (Critical)
PAROXETINE (PAROXETINE HCL TABS) (Mild)



Records Access Officer
50 Water Street, 17th Floor
New York, NY 10004

Andre Antrobus                                                    March 14, 2022
141 22 00 303
1818 Hazen Street
East Elmhurst, NY 11370

Dear Andre Antrobus:

In response to your request dated February 7, 2022 for:

- o **Video from 1/25/2022 of AA signing off on virtual court (pg. 1):**
  - ▪ Audio and Video of this time period
- o **Video and audio from 1/25/2022 to 1/31/2022 of attacks by patients and Andre Antrobus, complaining to staff (pg. 1)**
  - ▪ Hospital Police found a copy of video surveillance footage (25 mins) of the incident on 1/31/22, which depicts patients in addition to Andre Antrobus.
- o **Video and audio from 1/25/2022 of Andre Antrobus shutting off phone (pg. 2)**
  - ▪ Audio and Video of this time period
- o **Video and audio from 1/26/2022 to 1/31/2022 of different altercations between the other patient and Andre Antrobus (pg. 2)**
  - ▪ Hospital Police found a copy of video surveillance footage (25 mins) of the incident on 1/31/22, which depicts patients in addition to Andre Antrobus.
- o **Mental health records before 2005 (pg. 1) and Any and all mental health paper work from 2005 back to 1980s (pg. 3)**
  - ▪ Kings County's Medical Records Office have previously sent the requested medical records for these dates to Andre Antrobus on February 23, 2021 by certified mail. Return receipt and the USPS tracking number is 7019 0700 0000 8979 9291.
- o **Property of AA and who signed in place of AA on 1/27/2022 from the R Building (pg. 3)**
  - ▪ See attached records responsive to this request.

After reviewing your request and the relevant records, we have determined that the requested video must be redacted pursuant to Public Officers Law 87 2 (b) before it can be released. The redaction is necessary to protect the privacy of individuals and patients.

The vendor estimated cost of redacting the video will be $800. If this cost is prohibitive for you, you may submit a request for a waiver of the fees in writing, pursuant to the New York State Freedom of Information Law (FOIL).

If you choose to proceed with the request, please let us know so that we can proceed with the redaction. Once the redaction is complete, we will provide you with the requested video as soon as possible.

If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

Carmen Genao
Deputy Records Access Officer
HHCFoil@nychhc.org

Exhibit 8 D

NYC
HEALTH+        | **Kings County** | KINGS COUNTY HOSPITAL   Patient:Antrobus, Andre
HOSPITALS                              CENTER                MRN: 591534, J, DOB: 4/25/1965, Sex: M
                                451 Clarkson Avenue          Visit date: 2/1/2022
                                BROOKLYN NY 11203

**Behavioral Health Treatment Plan - Encounter Notes (continued)**

**Behavioral Health Treatment Plan by Neli Busutil, PhD at 02/01/22 1433 (continued)**
Patient was assessed in the unit by Dr. Ramshankar, Dr. Busutil and Ms.
Borukhove - RN along with Mr. Paterson - BHA. Patient was in his room,
very hostile and using foul language and quite guarded and stating " that
is private, none of your fucking business" for a lot of simple questions
during the assessment. He is quite paranoid and believes that he is being
arrested and put in mental hospitals as some of retribution by the
government and other vague entities as they are jealous of him and he owns
a three-story Brownstone, a law firm and needs to leave immediately as he
left a bag containing 10,000 dollars somewhere in the street and could not
why and where.

He is quite disjointed, hard to follow and illogical and keeps making
demands to have his phone, sneakers and get his property and get
discharged immediately.

He denied all focused psychiatric symptoms meant to assess mania,
depression, S/I or H/I as he believes he is smart, intelligent and needs
to be released immediately.

Interview had to be terminated by 15 minutes as patient became more and
more belligerent, hostile and uncooperative.

Patient has had two episodes of 4-point restraint today, one early in AM
and one at 1630 for psychotic agitated ad aggressive behaviors and has
received intramuscular PRN for the same.

As per CPEP:

Andre Antrobus is a 56 y.o. old male African American male brought it in
by EMS and NYPD
in handcuffs and reported that he wasn't under arrest, just left this
CPEP this morning where he was discharged to the police custody. At the
triage, it was reported that Andre was at store threatening to kill
people, stating that he is God, Alien and his hands are weapons. He added
"they are idiots, humans". He was angry highly agitated and verbally
aggressive, named the staff "dumb" and "You are dismissed". Patient is
unpredictable, aggressive, threatening uncooperative. He is impervious
to verbal intervention. He was administered and medicated with Haldol 7.5
and Ativan 3mg to prevent any further escalation of behavior, to prevent
any harm to self or others and alleviate his anxiety.

Furthermore, Andre is a single ("annulled") with 31 adult children,
undomiciled, unemployed has a history of schizoaffective disorder,
polysubstance use (cannabis/K2, cocaine, opioids); PMH multiple sclerosis,
ankle inversion surgery s/p reduction and casting, chronic back pain, s/p
craniotomy 2000 2/2 MVA, ex/lap for stab wound/collapsed lung, LLE
grafting, BIB DOC from Riker's Island for psychiatric evaluation and
found unfit to proceed on a 7.30 evaluation (utox negative). In PSYCKES

Exhibit 8 ○

NYC
HEALTH+
HOSPITALS | Kings County CENTER

KINGS COUNTY HOSPITAL
451 Clarkson Avenue
BROOKLYN NY 11203

Patient:Antrobus, Andre
MRN: 591534, DOB: 4/25/1965, Sex: M
Visit date: 1/27/2022

Behavioral Health Treatment Plan - Encounter Notes (continued)

Behavioral Health Treatment Plan by Neil Busuttil, PhD at 01/28/22 1336 (continued)
received Intramuscular PRN for the same.

As per CPEP:

Andre Antrobus is a 56 y.o. old male African American male brought it in
by EMS and NYPD
in handcuffs and reported that he wasn't under arrest, just left this
CPEP this morning where he was discharged to the police custody. At the
triage, it was reported that Andre was at store threatening to kill
people, stating that he is God, Alien and his hands are weapons. He added
"they are idiots, humans". He was angry highly agitated and verbally
aggressive, named the staff "dumb" and "You are dismissed". Patient is
unpredictable, aggressive, threatening, uncooperative. He is impervious
to verbal intervention. He was administered and medicated with Haldol 7.5
and Ativan 3mg to prevent any further escalation of behavior, to prevent
any harm to self or others and alleviate his anxiety.

Furthermore , Andre is a single ("annulled") with 31 adult children,
undomiciled, unemployed has a history of schizoaffective disorder,
polysubstance use (cannabis/K2, cocaine, opioids), PMH multiple sclerosis,
ankle inversion surgery s/p reduction and casting, chronic back pain, s/p
craniotomy 2000 2/2 MVA, ex/lap for stab wound/collapsed lung, LLE
grafting, BIB DOC from Riker's Island for psychiatric evaluation after
found unfit to proceed on a 7.30 evaluation (utox negative). In PSYCKES
patient was hospitalized at several medical facilities like ROCKLAND
Psychiatric Centre from 2/10/2018 to 9/25/19 Mid-Hudson Forensic
Psychiatric Centre and Kirby Forensic Centre. He was discharged 01/16/22
from CPEP at KCCH because he has violated the restraining order at his
father's house presenting to CPEP for agitated, acting hostile and
threatening behaviors. In Epic the sister Heather Antrobus #352.874.6562
reported on 3/11/21 her father has an active order of protection against
Andredue to his physically violebnt behavior towards him. PT also
physically aggressive towards the sister and has a history of chronic
medication/treatment non-adherence and substance abuse

On assessment at CPEP Andre was eating his lucnh with both hands as he was
very hungry and hasn't eaten for a while.Due to the medication which was
given to him because of his aggressive behavior he was sleepy and drowsy
but continues to speak to the writer. He stated that he was at the store
attending virtual court and trying to save his houses. At times, pt was
delusional and his thought was impaired. His speech was slurred and affect
was impaired due to the medication. He endorsed grandiosity and added that
he has many houses and added ,"They are trying to violate his rights".
Patient reported that he is feeling just fine, and he has no mental
illness. Pt did gave his address and said he is getting his medication
Abilify from Church ave but didn't give full details. PT denied visual or
auditory hallucination and denied suicidal or homicidal ideation.

*(handwritten notes in margins: "No Equaliting", "PRN,", "Exhibit 9")*

**HEALTH+ | Kings County** KINGS COUNTY HOSPITAL    Patient:Antrobus, Andre
**HOSPITALS** | CENTER    MRN: 591534, DOB: 4/25/1965, Sex: M
451 Clarkson Avenue    Visit date: 1/27/2022
BROOKLYN NY 11203

Behavioral Health Treatment Plan - Encounter Notes (continued)

Behavioral Health Treatment Plan by Neil Busuttil, PhD at 01/28/22 1336 (continued)
received Intramuscular PRN for the same.

As per CPEP:

Andre Antrobus is a 56 y.o. old male African American male brought it in
by EMS and NYPD
 in handcuffs and reported that he wasn't under arrest, just left this
CPEP this morning where he was discharged to the police custody. At the
triage, it was reported that Andre was at store threatening to kill
people, stating that he is God, Alien and his hands are weapons. He added
 "they are idiots, humans". He was angry highly agitated and verbally
aggressive, named the staff "dumb" and "You are dismissed". Patient is
unpredictable, aggressive, threatening, uncooperative.  He is impervious
to verbal intervention.  He was administered and medicated with Haldol 7.5
and Ativan 3mg to prevent any further escalation of behavior, to prevent
any harm to self or others and alleviate his anxiety.

Furthermore , Andre is a single ("annulled") with 31 adult children,
undomiciled, unemployed has a history of schizoaffective disorder,
polysubstance use (cannabis/K2, cocaine, opioids), PMH multiple sclerosis,
ankle inversion surgery s/p reduction and casting, chronic back pain, s/p
craniotomy 2000 2/2 MVA, ex/lap for stab wound/collapsed lung, LLE
grafting, BIB DOC from Riker's Island for psychiatric evaluation after
found unfit to proceed on a 7.30 evaluation (utox negative). In PSYCKES
patient was hospitalized at several medical facilities like ROCKLAND
Psychiatric Centre from 2/10/2018 to 9/25/19 Mid-Hudson Forensic
Psychiatric Centre and Kirby Forensic Centre. He was discharged 01/16/22
from CPEP at KCCH  because he has violated the restraining order at his
father's house presenting to CPEP for agitated, acting hostile and
threatening behaviors. In Epic the sister Heather Antrobus #352.874.6562
reported on 3/11/21 her father has an active order of protection against
Andre due to his physically violebnt behavior towards him. PT also
physically aggressive towards the sister and has a history of chronic
medication/treatment non-adherence and substance abuse

On assessment at CPEP Andre was eating his lucnh with both hands as he was
very hungry and hasn't eaten for a while.Due to the medication which was
given to him because of his aggressive behavior he was sleepy and drowsy
but continues to speak to the writer. He stated that he was at the store
attending virtual court and trying to save his houses. At times, pt was
delusional and his thought was impaired. His speech was slurred and affect
was impaired due to the medication. He endorsed grandiosity and added that
he has many houses and added ,"They are trying to violate his rights".
Patient reported that he is feeling just fine, and he has no mental
illness. Pt did gave his address and said he is getting his medication
Abilify from Church ave but didn't give full details. PT denied visual or
auditory hallucination and denied suicidal or homicidal ideation.

Exhibit: O



https://mail.google.com/mail/u/0/?ogbl#inbox/

EXhiBit:☆

*separation of powers legislative*
*21 NY Cone Laws § 4401-4402, N.Y. Men Hyg*
*Laws 22.05(g): men hyg Law § 13.15*

Laws 1977, ch 978, §§ 1, and 36–53, provide:

**Section 1. Preamble and legislative findings.** Protecting the mental health of the people of the state preventing the occurrence of mental illness, mental retardation and developmental disabilities, alcoholism and substance abuse and assuring that state residents afflicted by such disabilities receive appropriate care and treatment are matters of public concern.

*people ex rel powell v warden of Kgs ctx Hosp 73 A.O2d 654*

It is the policy of the state of New York that all of its residents who are disabled will receive services according to their individualized needs and, whenever possible, in their home communities to enable them to realize their fullest potential for self-fulfillment and independent living in society.

*people ex rel, anonymous v La Burt 14 A.Dead 560*

In order to facilitate the implementation of this policy, the legislature finds and declares that the provision and regulation of services to the separate classes of the mentally disabled can be most effectively and economically carried out by three independent offices, namely an office of mental health, an office of mental retardation and developmental disabilities, and an office of alcoholism and substance abuse which act in close concert with one another. In order to assure that there will exist maximum opportunity for cooperation among these offices, particularly in reference to individuals with multiple disabilities, interdisciplinary research cooperation among institutes, and in state and local relations in planning for and funding services to the mentally disabled these offices are appropriately established according to the provisions of this act, within the department of mental hygiene. The establishment of separate offices as proposed by this act is designed to provide the governmental framework within which available resources will be more effectively brought to bear in providing care and treatment for the different classes of disabled persons. The division of responsibilities for the care of the mentally disabled among three separate and autonomous offices will enhance the accountability of these governmental entities not only to the governor and legislature but also to the client groups they are designed to serve and will provide each office the measure of independence necessary in designing and implementing discrete programs of prevention, care and treatment for such client groups. This division of responsibilities is intended to lead to efficiencies in administration and shall in no way diminish the commitment of the state to maintain the highest quality of patient care both in facility

*matter of Ronald w. 25 A.O.3d 4 (N.Y.*
*const art XVII § 4 OMH is automonous agency*

*Auton-o-mous : having the*
*right or power of self*
*government!*
*Directive: something*
*that directs and usu. impel's*
*towards an action or goal*
*esp: order issued by high level of*
*policy: a definite course or*
*method of action selected to*
*guide and determine present*
*and future decisions*

*Exhibit II*

for the mentally disabled; alcoholism facilities; substance abuse facilities; development of local and unified services; community mental health services and mental retardation services companies; federal aid; interstate agreements and compacts for care of mentally disabled persons; rights of patients and persons dependent upon drugs; fees for services; appointment of conservators of property and committees for incompetents or patients; and proceedings relative to incompetent veterans and infant wards of United States Veterans' Administration.

Treated Elsewhere: are the constitutional provision for protection of the mental health of state inhabitants (see CLS New York Constitution Art 17 § 4); representation of incompetent persons and conservatees (see CLS Civil Practice Law and Rules §§ 1201–1209); protection of persons under disability (see CLS Surrogate's Court Procedure Act §§ 401–406); special proceeding for disposition of real property of incompetent or conservatee (see CLS Real Property Actions and Proceedings Law § 1701–1766); special proceeding for release of claims of incompetent against state for appropriation of real property (see CLS Real Property and Proceedings Law §§ 1801–1808); education of children with handicapping conditions (see CLS Education Law §§ 4401–4409); provisions relating to mentally ill inmates in institutions of department of correction (see CLS Correction Law §§ 400–405); institutions for the retarded in department of corrections (see CLS Correction Law §§ 430–449); commitment, confinement, and release of defendant acquitted on ground of mental disease or defect (see CLS Criminal Procedure Law § 330.20); and the establishment of certain state schools for the mentally defective (see Unconsolidated Laws Chap 128).

**HISTORY:**
Add, L 1972, ch 251; amd, L 1977, ch 978.

Prior Law:

Former Chap. **27 of the Consolidated Laws, add, L 1909, ch 32, under title of Insanity Law; amd, generally, by L 1927, ch 426, changing title to Mental Hygiene Law; repealed by § 91.01 of the 1972 Mental Hygiene Law. Former Mental Deficiency Law, add, L 1919, ch 633, repealed, L 1927, ch 426, but some provisions thereof, including Art 4, were transferred to the 1909 Mental Hygiene Law.**

## Title A Organization of Department of Mental Hygiene

Article 1 Short Title and Definitions

Article 5 Department of Mental Hygiene

### Article 1 Short Title and Definitions

§ 1.01.  Short title

§ 1.03.  Definitions.

§ 1.05.  [Repealed]

**HISTORY:**
Add, L 1977, ch 978, § 3, eff April 1, 1978.

Prior Law:

Former Article 1, **add, L 1972, ch 251; repealed, L 1977, ch 978, § 2, eff April 1, 1978.**

**Research References and Practice Aids**

Cross References:

This article referred **to in CLS Pub Health § 2780.**

Jurisprudences:

66 N.Y. Jur 2d **Infants and Other Persons Under Legal Disability § 71.**

**§ 1.01.  Short title**

This chapter shall be known and may be cited as the "Mental Hygiene Law".

**HISTORY:**
Add, L 1977, ch 978, § 3, eff April 1, 1978.

Prior Law:

Former **§ 1.01, add, L 1972, ch 251; repealed, L 1977, ch 978, § 2, eff April 1, 1978.**

Editor's Notes:

| NEW YORK STATE **Office of Mental Health** | Date issued 10/14/2022 | Supersedes | | Page 1 of 9 | Section# PC-701 |
|---|---|---|---|---|---|
| | Section: | | Patient Care | | |
| | Directive: | | Seclusion and Restraint | | |
| Official Policy Manual | Policy Owner:  Division of State Operated Services | | | | |

## I. POLICY STATEMENT

*NOTE: This policy shall not preclude security measures during transportation of patients who are committed to a facility pursuant to a criminal court order[1] or who are admitted to a facility in accordance with Mental Hygiene Law Article 10.*

The Office of Mental Health (OMH) always seeks to provide a safe and therapeutic environment. Seclusions and restraints (i.e., restrictive interventions) are clinically determined emergency safety measures for behavioral management and medical/post-surgical care purposes and are only to be used as a last resort to minimize harm to the patient and/or others.

1) The only justifications for the use of any seclusion or restraint are imminent danger, the administration of court-ordered medication over a patient's objection, or the administration of medications approved per 14 NYCRR 527.8 for minors.

2) Seclusions or restraints can only be employed when less restrictive techniques have been tried and failed, or in the rare instance where the patient's danger is of such immediacy that less restrictive techniques cannot be safely applied.

3) Restrictive interventions for medical/post-surgical care purposes (e.g., to limit mobility or temporarily immobilize post-surgery or dental procedure) are used to ensure good medical outcomes when mechanical supports are not effective. The following types of restraints are permissible for this purpose: four-point restraint, five-point restraint, wrist-to-belt restraint, mitts, and helmets.

4) When determining the need for any restrictive intervention, the following must also be considered in the patient's history: physical or sexual abuse; intellectual/developmental disability; deafness or hard of hearing that may require communication by hands; visual impairment that may compromise awareness of environment; and medical conditions.

5) Prior to participating in the seclusion or restraint of a patient, staff must receive OMH-approved training and must demonstrate competence in the appropriate application of, and alternatives to, seclusion and restraint. Training for staff that participate in seclusion and restraint must also include the use of first aid techniques (as required by profession) and certification in the use of cardiopulmonary resuscitation, including required periodic recertification. Refer to Section VI.6) of the OMH Manual to Supplement Policy Section PC-701, Seclusion and Restraint (hereto referred to as "PC-701 Supplemental Manual").

6) When determining whether a physical intervention constitutes a restrictive intervention, reasonable consideration must be given to the nature of the patient's behavior precipitating the intervention, federal and state guidance, and clinical judgment.

7) The use of seclusion and restraint can be reduced through a diverse and culturally sensitive environment that promotes the empowerment of patients, identifies, and implements strategies to

---

[1] For purposes of this policy, patients who are committed to a facility pursuant to an order of a criminal court means and includes patients committed to the custody of the Commissioner pursuant to Section 330.20 or Article 730 of the Criminal Procedure Law, as well as those subject to subsequent retention orders following an initial commitment made under these statues. This does not include (1) persons who were initially admitted under Criminal Procedure Law Article 730 "Final Orders of Observation" whose original charges have been dismissed and who are, within 72 hours, converted to voluntary or involuntary status (*Ritter vs. Surles*); or (2) persons admitted under Criminal Procedure Law Article 730 who are converted to civil status as the result of a Court order issued pursuant to *Jackson v. Indiana*. Questions regarding applicability of this provision should be directed to Counsel's Office.

Exhibit  III

considered to be discontinued because the staff member is present and is serving the same purpose as the restraint or seclusion.

The use of PRN orders for drugs or medication is only prohibited when a drug or medication is being used as a restraint. A drug or medication is deemed to be a restraint only if it is not a standard treatment or dosage for the patient's condition, and the drug or medication is a restriction to manage the patient's behavior or restricts the patient's freedom of movement. Using a drug to restrain the patient for staff convenience is expressly prohibited.

An exception to this is permitted for repetitive self- mutilating behavior. If a patient is diagnosed with a chronic medical or psychiatric condition, such as Lesch-Nyhan Syndrome, and the patient engages in repetitive self-mutilating behavior, a standing or PRN order for restraint to be applied in accordance with specific parameters established in the treatment plan would be permitted. Since the use of restraints to prevent self-injury is needed for these types of rare, severe, medical and psychiatric conditions, the specific requirements (1 hour face-to- face evaluation, time limited orders, and evaluation every 24 hours before renewal of the order) for the management of violent behavior do not apply. However, the patient must still be continuously monitored in accordance with all other restraint requirements.

Patients of all ages are vulnerable and at risk when restrained or secluded to manage violent or self-destructive behavior. Therefore, in every case where restraint or seclusion is used, the requirement that the intervention be ended at the earliest possible time applies to all uses of restraint or seclusion. Each written order for restraint or seclusion shall be no more than 4 hours for adults; 1 hour for children and adolescents ages 9 to 17; and 30 minutes for children under 9, with the following exceptions:



- For manual restraint, orders must be limited in duration to 30 minutes for patients of any age. In every case, the use of manual restraint must be limited to the duration of the emergency situation, regardless of the length of the order. Staff must be made aware that a prolonged struggle can produce what is called a "catecholamine crisis," or "adrenergic storm." These conditions can occur to either or both the patient or staff, and the results could be fatal. ***Extreme caution should be exercised during episodes of manual restraint lasting more than 10 minutes, to ensure the health and safety of all involved.***

- If an episode of mechanical restraint or seclusion has exceeded 2 hours for adults, 1 hour for children and adolescents ages 9 to 17, or 30 minutes for children under age 9, and it is expected that restraint or seclusion will be required beyond such time periods, the facility's clinical medical director or director of psychiatry, or his/her designee, must be notified and consulted.

**Best Practice Guidance - "Witnessing"**

Recognizing that restraint and seclusion are counterintuitive to recovery and hope, the New York State Office of Mental Health has taken a pro-active approach that emphasizes the use of alternatives to restrictive interventions and the employment of evidence-based strategies to create violence and coercion-free cultures. There are many questions regarding the efficacy of seclusion and restraint as treatment interventions for maintaining safety in inpatient and residential psychiatric programs. Oversight groups such as the Joint Commission have encouraged

February 8, 2017

**4 Misc.2d 1021 (1956)**

## The People of the State of New York, Plaintiff,

v.

## Stanley Russell, Defendant.

### County Court, Kings County.

November 15, 1956.

*David N. Fields* for defendant.

*Edward S. Silver*, District Attorney (*Eli Kramer* of counsel), for plaintiff.

1022    *1022NATHAN R. SOBEL, J.

Defendant moves to dismiss indictment.

I have examined the Grand Jury minutes.

The charge is manslaughter second degree. The alleged crime was committed while the defendant was a duly committed patient in the Brooklyn State Hospital. He has been such a patient on and off for a period of 10 years. On the date of the alleged crime to wit, June 8, 1955, he was diagnosed as a "dementia praecox, catatonic type".

One of the witnesses, a guard at the institution, states he saw the defendant "either hit cr push the patient, Max Oster, thereby knocking him to the floor." Another guard states "I saw Stanley Russell hit Max Oster and knock him on the floor." Both guards testify that this occurred while the ward patients were walking through the hall on the way to lunch. There was no quarrel between the patients, nor words exchanged. They always appeared to be friendly.

The testimony establishes that the deceased, Max Oster, struck his head on a bench or on the floor. Four days after the fall, on June 12, 1955, he was taken to Kings County Hospital. There he was diagnosed as suffering from a condition which may or may not have resulted from the fall. He improved until June 23, 1955. On that day as a result of tests, it was decided to operate. The doctor testifies "At the operation there was no fracture of the skull noted and the X-ray report of the skull, Report H 137214, the skull shows no evidence of fracture, basal projection was not made, chest showed no recent pulmonary or repleural pathology, the heart is enlarged and shows a hypertensive configuration." The doctor when asked whether the condition found on the operation could have been caused by a man's head coming in contact with the floor or any other object, answered — "It could possibly be caused." "That could be one of the causes". On July 8, two weeks after the operation, the patient died.

The medical examiner was equally vague. He found a tumor, pneumonia and a hemorrhage. But it is quite evident that he could not give the cause of death.

This defendant can never in my opinion be brought to trial. He quite evidently does not now, or in the future will be able to, understand the nature of these proceedings. However, as a result of this indictment, he cannot be treated in a State hospital

1023    under mental hygiene. He must be committed to *1023 Matteawan, if this indictment is permitted to stand, and in all likelihood spend the rest of his life there.

This is the first indictment which has come to my attention of a patient in a State hospital. Fights and assaults are commonplace particularly in the disturbed wards, but it has never been a policy to indict.

Of course, there is no duty on the People to establish the sanity of a defendant before a grand jury. There is a presumption of sanity. However, where evidence is introduced before the grand jury to show a legal commitment and a diagnosis of dementia praecox, the testifying doctors should at least have been asked whether the defendant was in their opinion legally sane pursuant to the standards prescribed by section 1120 of the Penal Law. This was not done.

However, it is quite clear as a matter of law that any degree of mental illness affects the intent with which an act is committed. I rule that there is insufficient evidence as a matter of law, to establish that there was in this case an assault, i.e., an intentional push or blow. From the testimony of the guards the push or blow could have been accidental or intentional. When this testimony is weighed with the testimony concerning the defendant's mental condition, it is insufficient as a matter of law, to establish a prima facie assault.

I also find that there is insufficient evidence as a matter of law, to establish that the assault, if any, was a direct or even indirect producing cause of death.

The indictment is dismissed. Submit order.

Save trees - read court opinions online on Google Scholar.

EXHIBIT V

Administrative Law > Judicial Review > Standards of Review > Substantial Evidence

**HN1** **Standards of Review, Substantial Evidence**

Upon judicial review of a determination rendered by an administrative body following a hearing, the appellate court's function is limited to consideration of whether the determination is supported by substantial evidence.

More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Healthcare Law > Healthcare Litigation > Actions Against Facilities > General Overview

View more legal topics

**HN2** **Healthcare Litigation, Actions Against Facilities**

Mental Hygiene Law § 33.04 defines "restraint" as the use of an apparatus on a patient which prevents the free movement of both arms or both legs or which totally immobilizes such patient, and which the patient is unable to remove easily. Mental Hygiene Law § 33.04(a). More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Healthcare Law > Healthcare Litigation > Actions Against Facilities > General Overview

View more legal topics

**HN3** **Healthcare Litigation, Actions Against Facilities**

See Mental Hygiene Law § 33.04(b). More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Healthcare Law > Healthcare Litigation > Actions Against Facilities > General Overview

View more legal topics

**HN4** **Healthcare Litigation, Actions Against Facilities**

Regulations promulgated by the New York State Office of Mental Health (OMH) define the term "restraint" as including the use of an apparatus, 14 NYCRR 27.2(d). However, according to current OMH policy, manual restraints that are employed without the use of an apparatus constitute a "restraint," and should be employed only where there is a danger to life and limb, and only as a last resort. More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Administrative Law > Agency Rulemaking > Formal Rulemaking

**HN5** **Agency Rulemaking, Formal Rulemaking**

State Administrative Procedure Act § 202(1)(a) provides, in part, that prior to the adoption of a rule, an agency shall submit a notice of proposed rule making to the secretary of state for publication in the state register and shall afford the public an opportunity to submit comments on the proposed rule. § 202(1)(a); N.Y. Const. art. IV, § 8. A "rule" is defined by the State Administrative Procedure Act to include the whole or part of each agency statement, regulation or code of general applicability that implements or applies law. State Administrative Procedure Act § 102(2)(a)(i), (b)(iv). A "rule or regulation," for purposes of the New York State Constitution, has been described as any kind of legislative or quasi-legislative norm or prescription which establishes a pattern or course of conduct for the future. The Court of Appeals of New York has stated that a rule or regulation is a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers. Excluded from the definition of a "rule" are forms and instructions, interpretive statements, and statements of general policy which in themselves have no legal effect but are merely explanatory. § 102(2)(a)(i), (b)(iv). More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*    ◆ 1

Administrative Law > Agency Rulemaking > Formal Rulemaking

Healthcare Law > Healthcare Litigation > Actions Against Facilities > General Overview

View more legal topics

**HN6** **Agency Rulemaking, Formal Rulemaking**

The New York State Office of Mental Health's policy, which essentially amends the Mental Hygiene Law and existing regulations to include "manual restraints" within the meaning of "restraint," is a rule within the meaning of the New York Constitution and the State Administrative Procedure Act. More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Administrative Law > Judicial Review > Remedies > General Overview

Civil Procedure > Remedies > Damages > General Overview

**HN7** **Judicial Review, Remedies**

Consequential damages are not recoverable in a proceeding pursuant to CPLR art. 78. CPLR 7806. More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

*Exhibit VI*

Document:                        Dunn v. State, 34 A.D.2d 267                    Actions⌄

📁⌄  🖨  ✉  ⬇  ⬚  Go to ⌄  Page  *Page #*  ⌃ ⌄  Search Document  Q

### Ⓐ Dunn v. State, 34 A.D.2d 267

#### Copy Citation

Supreme Court of New York, Appellate Division, Third Department

June 2, 1970

Claim No. 43974

**Reporter**

34 A.D.2d 267 * | 312 N.Y.S.2d 61 ** | 1970 N.Y. App. Div. LEXIS 4613 ***

Herma D. Dunn, Individually and as Administratrix of the Estate of Herman Springhorn, Deceased, et al., Appellants, v. State of New York, Respondent

**Prior History:** [***1] Appeal from a judgment entered May 29, 1968 upon a decision of the Court of Claims (John P. Gualtieri, J.), dismissing the claim.

**Disposition:** Judgment reversed, on the law and the facts, with costs, and a new trial ordered, limited to the issue of damages.

## Core Terms

patient, attendant, claimant's, escaped, proximate cause, stolen car, collision, reckless, pursued

## Case Summary

### Procedural Posture

Appellant administratrix of decedent's estate challenged the judgment of the Court of Claims (New York), which dismissed her wrongful death claim against respondent state alleging that the state's employees were negligent in allowing a mental patient to escape from a state hospital and that the state police were negligent in the manner in which they pursued the patient after he stole a car.

### Overview

The decedent was killed when a stolen car driven by an escaped state mental patient struck his car. The administratrix filed a wrongful death action against the state. The trial court dismissed her claim at the close of the evidence. On appeal, the court reversed, finding that the state was negligent in its failure to prevent the mental patient's escape. The court held that the patient had demonstrated assaultive tendencies and the hospital acknowledged the duty to prevent his escape when they placed him in a closed ward. The court ruled that it was reasonable to conclude that the absence of an additional attendant in the ward contributed to the patient's escape. Further, the court concluded that the state's negligence was the proximate cause of the death because it was not unreasonable to expect an escaped patient to steal a car and drive in a reckless manner. The court concluded that there was no evidence of reckless conduct on the part of the police in their pursuit of the patient in the car since they had their dome lights on, used their siren, and did not have time to warn the decedent of the patient's approach.

### Outcome

The court reversed the dismissal of the administratrix's negligence claim against the state on the law and ordered a new trial limited to the issue of damages.

▼ LexisNexis® Headnotes

Torts > Public Entity Liability ⌄ > Liability ⌄ > General Overview ⌄

**HN1** ⚖ **Public Entity Liability, Liability**

A mental patient is irresponsible and the state's liability for the acts of escaped mental patients known to be dangerous is greater than for the acts of other escapees from state institutions. Q More like this Headnote

*Exhibit VII*

Document:                    Scolavino v. State, 297 N.Y. 460                Actions ⌄

Go to ⌄   Page   Page #   ∧ ∨   Search Document

# Scolavino v. State, 297 N.Y. 460

### Copy Citation

Court of Appeals of New York

Argued April 15, 1947 ; May 22, 1947, decided

No Number in Original

**Reporter**

297 N.Y. 460 * | 1947 N.Y. LEXIS 971 ** | 74 N.E.2d 174

MICHAEL SCOLAVINO, an Infant, by ANTHONY SCOLAVINO, His Guardian ad Litem, Respondent, v. STATE OF NEW YORK, Appellant. (Claim No. 27647.)

**Prior History:** [**1] Scolavino v. State of New York, 271 App. Div. 618, affirmed.

APPEAL from a judgment in favor of claimant, entered January 21, 1947, upon an order of the Appellate Division of the Supreme Court in the third judicial department which modified, on the law and the facts, and affirmed as modified, a judgment in favor of claimant entered upon a decision of the Court of Claims (LOUNSBERRY, J.; opinion 187 Misc. 253). A specified conclusion of law was reversed and a new conclusion of law made by the Appellate Division in lieu thereof. The modification consisted of increasing the award from $9,000 to $20,000. Claimant, twenty years old, an inmate of a State hospital for the mentally ill, while strapped to his bed by a restraining sheet was attacked in the nighttime by another inmate, who had succeeded in breaking out of his restraining sheet. As a result of the attack claimant was rendered permanently blind. He also suffered a fractured nose and bruises. There was evidence that prior to the attack officers and employees of the institution knew that bad feeling existed between claimant and his assailant, that both inmates were violent and assaultive in their conduct and that they [**2] had quarreled with, and threatened, each other at times when confined in restraining sheets. There was also evidence that claimant's assailant had escaped from restraining sheets on three previous occasions, that such sheets often became torn and defective, that no separation of serviceable and defective sheets was ever made and that on the night in question claimant and his assailant had been placed in the restraining room in beds only five feet apart. There was further evidence that at the time of the assault 66 patients were quartered in the ward, that there was no guard in the restraining room, that two attendants were on duty in another part of the ward at a place where they could not observe the patients and that requirement that inspection trips be made every thirty minutes was not closely observed. In the Court of Appeals the State contended that rulings of the trial court in connection with the admission of hospital records and a letter pertaining to claimant's assailant constituted error, that the Appellate Division failed to consider the proper factors in measuring the damages, and that such damages were excessive as a matter of law.

▼ Headnotes/Summary

**Headnotes**

State - negligence - assault [**3] - damages - action by twenty-year-old inmate of State mental institution, to recover damages for personal injuries inflicted, while claimant confined in restraining sheet, by another inmate who broke from his restraining sheet - evidence that prior to assault hospital attendants knew that bad feeling existed between claimant and assailant, that assailant assaultive in conduct and had previously escaped from restraining sheet, and that at time of assault both patients confined in same room in ward where only 2 attendants were in charge of 66 patients - judgment of Appellate Division increasing award from $9,000 to $20,000, affirmed.

**Counsel:** Nathaniel L. Goldstein, Attorney-General (John R. Davison and Wendell P. Brown of counsel), for appellant.

Milton M. Leichter and Julius Wolfson for respondent.

## Opinion

[*462] Judgment affirmed, with costs; no opinion. [See Flaherty v. State of New York, 296 N.Y. 342, decided herewith.]

at p. 738). And, continued the court, "a person charged by a state with account of his incapacity to proceed to trial cannot be held more than the reasona whether there is a substantial probability that he will attain that capacity in the foreseeab. is not the case, then the State must either institute the customary civil commitment proceeding ... commit indefinitely any other citizen, or release the defendant."

The principle enunciated in *Jackson* points the conclusion here. The appellant is mentally ill, albeit dangerously so, not a criminal and has never been involved in a criminal proceeding. His confinement is necessary for the protection of others but, to be constitutional, it must be therapeutic, not punitive. How egregious a placement in Matteawan would be is readily apparent from a consideration of the probable reaction of the appellant — whose mental health has not become stabilized but whose response to medication and sympathetic and concerned treatment has been favorable — upon confrontation with a correction officer trained to deal with a prison population. And if, despite this, the appellant did recover, he would be subject in the meantime to the hazard of "emerging from his incarceration", as this court has observed in a not

166     unrelated context, "well tutored in the ways of crime." (*Matter of Ellery C.*, 32 N Y 2d 588, 591.) *166 No "reasonable relation" exists between so harsh a confinement and the purpose sought to be achieved.

Only confinement in a hospital under the jurisdiction of the Department of Mental Hygiene, then, is suitable; incarceration in a penal, security-oriented facility such as Matteawan would be wholly incompatible with, indeed destructive of, this purpose. A comparison of the differences in purpose and treatment between the two types of institution makes this abundantly clear.

By provisions of Constitution and statute (N. Y. Const., art. XVII, § 4; new Mental Hygiene Law, § 1.03 *et seq.*; cf., also, *Covington v. Harris*, 419 F.2d 617, 625; *Rouse v. Cameron*, 373 F.2d 451, 453; Morris, The Confusion of the Confinement Syndrome, 17 Buffalo L. Rev. 651, 679), the State is responsible for the "care, treatment, rehabilitation, education, and training of the mentally ill". State hospitals under the jurisdiction of the Department of Mental Hygiene are required to furnish these services at a cost determined by ability to pay (new Mental Hygiene Law, § 7.05, subd. [a]; §§ 7.15, 9.03, 43.01), and the department is charged with seeing that "personal and civil rights of persons receiving care and treatment are adequately protected" (new Mental Hygiene Law, § 7.05, subd. [c]). Accordingly, great freedom is afforded civilly committed patients, wherever possible, in the matter of correspondence, visitors and access to the Mental Health Information Service; home visits, when feasible, are authorized and encouraged (new Mental Hygiene Law, §§ 15.01, 15.03, 15.05; 14 NYCRR Part 21).

Matteawan, in sharp contrast, is a correctional facility maintained by the Department of Correction for the primary purpose of "holding in custody and caring for such mentally ill persons held under any other than a civil process as may be committed to the department by courts of criminal jurisdiction" (Correction Law, § 400). Although originally conceived as "something less than a prison but more than a hospital," Matteawan has been "allowed to falter" and to "drift into decline as a pioneer mental hospital and into constantly improved status as a security institution" (Mental Illness, Due Process and the

167     Criminal Defendant — A Second Report *167 and Additional Recommendations by the Special Committee on the Study of Commitment Procedures and the Law Relating to Incompetents of the Association of the Bar of the City of New York [1968], p. 63). It has become increasingly devoted only to mentally ill convicted criminals (cf., e.g., CPL 730.50, subd. 1; CPL 730.60, subd. 1; Correction Law, § 409), who, however much they may be entitled to psychiatric assistance, are, nevertheless, serving out their prison terms. It has been characterized by more than one court and commentator in such terms as a "maximum security institution" "no different from a jail". Imposing restrictions not applicable to civil patients. "There is no freedom of movement. Patients are always under strict supervision. They are confined to wards which are locked; they have no access to the outside. They are not permitted to visit their homes. They cannot look forward to convalescent care." (Katz, Goldstein and Dershowitz, Psychoanalysis, Psychiatry and Law [1967] pp. 696-697; see, also, *Neely v. Hogan*, 62 Misc 2d 1056, 1060; Morris, Treatment of Mentally Ill "Non-Criminal Criminals" in New York, 18 Buffalo L. Rev. 393, 418; cf. *Jackson v. Indiana*, 406 U. S. 717, 731, *supra*; *Baxstrom v. Herold*, 383 U. S. 107, 113-114.) Correspondence, visitors and access to the Mental Health Information Service are much more limited than for mentally ill civil patients (Correction Law, § 413).

Had section 85 — or its successor provision statute, section 29.13 — contained some less "restrictive alternative" than Matteawan for dangerously mentally ill civil patients, our conclusion might be different. (See, e.g., *Covington v. Harris*, 419 F.2d 617, 623, *supra*; see, also, *Roe v. Wade*, 410 U. S. 113, 155; *Aptheker v. Secretary of State*, 378 U. S. 500, 512-513; *Shelton v. Tucker*, 364 U. S. 479, 488.) "[T]he principle of the least restrictive alternative consistent with the legitimate purposes of a commitment", Chief Judge BAZELON wrote in the *Covington* case, "inheres in the very nature of civil commitment * * *. A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law" (419 F. 2d, at p. 623). There is, however, no

168     possible way of construing section 85 to preserve its constitutionality since it provides no substitute for Matteawan. As *168 indicated, though, there are at least two State hospitals in the vicinity of New York City with closed wards for the care of the dangerously mentally ill as well as a third in the mid-Hudson area to which such patients may be sent. Implicit in the petitioner's resistance to the appellant's transfer to these institutions is the absence of funds to provide for civil placement of all civil patients. But the "[c]ontinuing failure to provide suitable and adequate treatment cannot be justified by lack of staff or facilities." (*Rouse v. Cameron*, 373 F.2d 451, 457-458, *supra*; see, also, *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 687, *supra*; cf. *Doe v. General Hosp. of District of Columbia*, 434 F.2d 427, 433; *Matter of Ellery C.*, 32 N Y 2d 588, 591, *supra*.) Any such deficiency, then, cannot render the appellant's transfer to Matteawan defensible.

The petitioner's reliance on language in *Baxstrom v. Herold* (383 U. S. 107, 115, *supra*) and *People v. Lally* (19 N Y 2d 27, 35) to support his position is misplaced. The only point at issue in those cases was whether a mentally ill defendant who was ending a term of imprisonment (Baxstrom) or who had been acquitted on the ground of insanity (Lally) was entitled to civil commitment and a jury trial of his need therefor. In each instance, the court decided those questions in the affirmative. The propriety of commitment of a dangerously mentally ill patient to a Department of Correction institution was, it is manifest, entirely peripheral to either court's decision.

Exhibit IX

World J Psychiatry. 2022 Jan 19; 12(1): 1–23.
Published online 2022 Jan 19. doi: 10.5498/wjp.v12.i1.1

PMCID: PMC8783168
PMID: 35111577

# Prevalence and correlates of aggressive behavior in psychiatric inpatient populations

Hunor Girasek, Vanda Adél Nagy, Szabolcs Fekete, Gabor S Ungvari, and Gábor Gazdag

## Abstract

Aggressive behavior in patients with psychiatric disorders is attracting increasing research interest. One reason for this is that psychiatric patients are generally considered more likely to be aggressive, which raises a related question of whether diagnoses of psychiatric disorders predict the prevalence of aggressive behavior. Predicting aggression in psychiatric wards is crucial, because aggressive behavior not only endangers the safety of both patients and staff, but it also extends the hospitalization times. Predictions of aggressive behavior also need careful attention to ensure effective treatment planning. This literature review explores the relationship between aggressive behavior and psychiatric disorders and syndromes (dementia, psychoactive substance use, acute psychotic disorder, schizophrenia, bipolar affective disorder, major depressive disorder, obsessive-compulsive disorder, personality disorders and intellectual disability). The prevalence of aggressive behavior and its underlying risk factors, such as sex, age, comorbid psychiatric disorders, socioeconomic status, and history of aggressive behavior are discussed as these are the components that mostly contribute to the increased risk of aggressive behavior. Measurement tools commonly used to predict and detect aggressive behavior and to differentiate between different forms of aggressive behavior in both research and clinical practice are also reviewed. Successful aggression prevention programs can be developed based on the current findings of the correlates of aggressive behavior in psychiatric patients.

Keywords: Aggression, Mental disorders, Inpatients, Prevalence, Risk factors, Risk assessment

**Core Tip:** The aim of this paper is to provide an overview of the prevalence of aggressive behavior of patients with various psychiatric disorders focusing mainly on inpatient populations. It also discusses the most commonly used measurement tools for aggressive behavior. As aggressive behavior endangers the safety of both patients and staff, predicting aggression is a key to its prevention. This review also highlights the importance of risk assessment and prevention of aggression in psychiatric patients.

## INTRODUCTION

The relationship between psychiatric disorders and aggressive behavior has always been a contentious issue, as it is difficult to determine whether psychiatric patients are more likely to be aggressive and whether psychiatric disorders predict aggressive behavior[1].

The authors of most recently published studies agree that there is an increased risk of aggressive behavior in certain psychiatric disorders[2-5]. In a meta-analysis, the proportion of patients classified as aggressive during their acute psychiatric treatment ranged from 8% to 44%[2]. Aggressive behavior and violence pose a serious challenge to psychiatric care providers as they threaten the safety of both the patients and staff[1,2,6]. They also result in longer hospitalization times and the increased stigmatization of psychiatric patients[3]. To predict and prevent violent events in inpatient units, it is crucial to recognize the relationships of the sociodemographic and clinical characteristics of inpatients with the risk of aggression[2].

The aims of this paper are to review the risks of aggressive behavior associated with different psychiatric disorders and assess the commonly used measurement tools to measure various aspects of aggressive behavior.

## DEFINITION OF AGGRESSION

There are several definitions of aggression, a rather broad term used with different emphases in criminology, political and social science, and psychiatry. For the purpose of this review, aggression is defined as a human behavior manifesting as verbal or physical acts that target other human beings, animals, or objects with the aim of causing harm. The aggressors are not always aware of the implications of their actions and the damage caused. If the harm is coincidental or a secondary consequence, the act is not considered as aggressive[7,8].

*Exhibit 8 X*

## Ⓐ Pope v. State, 308 N.Y. 813

Copy Citation

Court of Appeals of New York

Argued January 18, 1955 ; March 3, 1955, decided

No Number in Original

**Reporter**

**308 N.Y. 813** * | 125 N.E.2d 870 ** | 1955 N.Y. LEXIS 1077 ***

HENRY L. POPE, as Administrator of the Estate of EVELYN M. POPE, Deceased, Appellant, v. STATE OF NEW YORK, Respondent (Claim No. 30718).

**Prior History:** [***1] Pope v. State of New York, 283 App. Div. 853, affirmed.

APPEAL from a judgment, entered March 24, 1954, upon an order of the Appellate Division of the Supreme Court in the fourth judicial department, which affirmed, by a divided court, a judgment entered upon a decision of the Court of Claims (LOUNSBERRY, P.J.). The claim was brought to recover damages for the wrongful death of claimant's wife and for her conscious pain and suffering. There was evidence that claimant's wife had been admitted as a patient to Willard State Hospital on September 27, 1950; that she was confined to ward 9 therein where there were 34 female patients, all classed as deteriorated type, incurable, but not dangerous; that the attendant in charge of said ward 9 also cared for 42 patients in ward 6; that, on the morning of January 2, 1951, decedent was found on the floor of her ward having been badly beaten and assaulted by another patient; that decedent had sustained a fractured skull; that unconsciousness came early and before many of the injuries occurred; that injuries inside decedent's mouth occurred after death; that there were no bruises or lacerations on arms or hands resulting from effort to [***2] avoid injury, and that lack of such bruises, called "defense markings", is taken by pathologists to mean that the injured party was unable to defend herself because she was unconscious. The Court of Claims stated that the State of New York was negligent in the care and supervision of ward 9; that such negligent supervision was the proximate cause of the death of claimant's wife, and, in awarding claimant $345 for funeral expenses, the court further stated: "[I]t is apparent that death was almost instantaneous and that she experienced no pain or suffering * * * The claimant has failed to establish by a fair preponderance of the evidence that the deceased would have recovered her mental and physical health to a point where she could have resumed her place in society outside of a State institution, or that she endured any pain and suffering as a result of the assault prior to her death." In the Court of Appeals claimant argued that a recovery for conscious pain and suffering should have been allowed. Respondent argued that recovery for conscious pain and suffering had been properly denied, and that decedent's death did not cause pecuniary loss to her estate.

▼ Headnotes/Summary

**Headnotes**

Negligence - negligent [***3] operation of State mental hospital - claimant's decedent, patient in State mental hospital, suffered severe injuries resulting in death when assaulted by another patient - evidence that decedent was not conscious when major injuries inflicted upon her - Court of Claims found State negligent and awarded funeral expenses to claimant, but denied recovery for conscious pain and suffering, stating that decedent did not endure any pain as result of assault - judgment properly affirmed.

**Counsel:** Henry William Koch and Theodore M. Coburn for appellant.

Jacob K. Javits, Attorney-General (Lawrence H. Wagner and Henry S. Manley of counsel), for respondent.

## Opinion

**[*814]** [**870]** Judgment affirmed; no opinion.

Concur: CONWAY ▼, Ch. J., DESMOND, DYE, FULD ▼, FROESSEL, VAN VOORHIS ▼ and BURKE, JJ.

*Exhibit? XI*

medical Definition

para: prep to for = for the purpose of in order to / forever / what for?

Para: To be pararell

false: untrue

hemmorrhage: Bleeding profusely of cerebal / cerebrovascular / intraventricular = concealed

Sequelae: condition of repeated injury

lateral: to the side

superficial: To surface tension is shallow

infer: to surmise or guess?

subdural: under the dura matter

dura matter: membrane exterior

encephalomalacia: softening of the brain

subarachnoid: situated or occuring below The arachnoid membrane space

Arachnoid: web like membrane that covers The Brain and spinal cord

Edema: Abnormal amount of fluid in the intercellular tissue

Echymosis: change of color from blue to green

Echymosis:

Neurological: study of nervous system

ntra cranial: within The cranium

cranium: skull Brain case

bilateral: having or rel to two sides

Temporal: rel. to the temples

hemisphere: half of a spherecal organ or structure

Basal: rel To base

is-che-mia: Deficient supply of Blood to the brain

Ethmoid: A sinus Air cavity within Ethmoid bone

acute: short duration / less than 90° de / sharpen

substance matter: connective cartilage tissue fibe

**...n-ta-cle**: flexible projections from head or mouth

**sylvian**: the ventricles that connect membrane

**sylvan**: rel to forest charactics

**interventricular**: localize ontrance to ventricle

**hema toma**: localized collection of blood to a org

**lacrimal**: to tears or to tear ducts

**Amnesia**: loss of memory

**Atrophy**: deterioration of cells/spinal

**Autonomous**: functioning independently/division

**deficit**: (no) deficiency in amount

**sensory**: relating to sensation or perception or sens

**focal lenth**: the distance of a focus

**innocuous**: Harmless / non offensive

**intact**: untouched, anything that diminish

**Trauma**: wound a bodily or mental injury

**Altercation**: noisy or Angry disputes

**Angry**: feeling or showing anger enraged, irate
mad, wrathful, indignant

**indignation**: Anger, Aroused By something "un-
Just, unworthy or mean=

**leaflet**: division of a composed or decayed lay

**Par**: stated value /equality /standard normal co

**Hygroma**: increase fluid containing so

**sphenoid**:

**Edema**: ABnormal amount of flui

**cere bro**: mid Brain/cerebrum connected to spi

**Sciatic Nerve**: nerve from spine to thigh to foo

**infero-medial**: rel. to or situated to middle

**maxilla**: bone of the upper Jaw.

**maxillary**: rel to the Jaw bone

**aerate**: to ventilate / To circulate fresh air.

**Diffuse**: from high to lower/not concentration

**Para nasal sinuses**: ...

medical definitions pg 3

Duramater: The outer membrane that covers the encephlum and the spinal cord

opacifation: Process of rendering something opaque

opaque: that blocks the passage of light

Afebrile: without fever

corenea: transparent covering of the eyeball,

choroid: supplies Blood,

orbit: boney cavity that surrounds the eyeball

para: for the purpose of to order to / to hever

Tissue para: poir couple

focal: is focus Alert

Axilla: armpit

The People of the State of New York, Respondent, v. Anthony Contreras, Appellant
Supreme Court of New York, Appellate Division, First Department
108 A.D.2d 627; 485 N.Y.S.2d 261; 1985 N.Y. App. Div. LEXIS 42978

[NO NUMBER IN ORIGINAL]
February 7, 1985

**Judges:** Concur – Sandler, Sullivan and Carro, JJ. Kupferman, J. P., dissents in a memorandum.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Contending the element of physical injury was not established as a matter of law, defendant appealed from a judgment of the Supreme Court, Bronx County (New York), convicting him, after a jury trial, of robbery in the second degree and imposing sentence. Conviction of robbery in the second degree was reversed where convictions upon which inquiry would have been allowed were too remote in time to be probative on credibility, and prosecutor exceeded fair comment in summation.

**OVERVIEW:** A woman was depositing letters in a mailbox when she was approached from behind, pushed against the mailbox, and told to surrender her pocketbook. As she was pressed against the mailbox, the woman felt pain in her left arm and stomach and saw blood trickling down her arm. Defendant was arrested upon being pointed out by a man who had come to the aid of the woman in the incident. No weapon was recovered, and the woman's forearm, injured in the incident, was "nontender" with "full range of motion." Defendant was convicted of robbery in the second degree and appealed. He argued that he was arrested solely because he was wearing a maroon jacket, and offered a defense of misidentification. The court reversed, finding that the element of physical injury was not established as a matter of law, and the totality of errors warranted a new trial. Defendant's prior convictions, upon which inquiry would have been allowed by the lower court, were too remote in time to be truly probative on credibility, and the prosecutor exceeded fair comment in summation when he referred to matters not in evidence.

**OUTCOME:** Judgment was reversed and the indictment dismissed with leave to resubmit to the grand jury, due to the totality of errors and because physical injury was not established as a matter of law.

### LexisNexis Headnotes

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Robbery > General Overview*

"Physical injury" means impairment of physical condition or substantial pain. N.Y. Penal Law § 10.00 (9).

### Opinion

{108 A.D.2d 627} {485 N.Y.S.2d 262} Judgment, Supreme Court, Bronx County (Covington, J.), rendered January 10, 1983, convicting defendant, after a jury trial, of robbery in the second degree and sentencing him to an indeterminate term of imprisonment of from 5 to 15 years, reversed, on the law and the facts and as a matter of discretion in the interest of justice, and the indictment dismissed with leave to resubmit to the Grand Jury, the matter remanded to Trial Term for the purpose of issuing a securing order pursuant to CPL 210.45 (9), and defendant committed to the custody of the Department of Correction pending the issuance of such order.

On the afternoon of February 15, 1982, 79-year-old Esther Josephs was depositing letters in a mailbox when she was approached from behind, pushed against the mailbox and told to surrender her pocketbook. As she was pressed against the mailbox, Mrs. Josephs felt pain in her left arm and stomach and saw blood trickling down her arm. She turned to face her assailant and observed a light-mustachioed man in a dark-red "fancy jacket", with two front teeth missing, and holding a six-inch "shiny object." He grabbed at her pocketbook. Denis Cruz, standing nearby, heard the victim's screams, grabbed a tire iron and shoved away Mrs. Josephs' assailant, whom he later identified as defendant. Mr. Cruz was also able to recover the pocketbook. Police officers responded to the scene approximately five minutes later and took the victim and Mr. Cruz in a patrol car to look for the perpetrator. Within three or four minutes after they began cruising the neighborhood, Cruz pointed to defendant, sitting on a park bench in a maroon jacket, as the culprit. {108 A.D.2d 628} Defendant, 50 years of age, had a light mustache and was missing two front teeth. He was arrested immediately; however, no weapon was recovered. Later, at the hospital, a doctor found a small one-quarter-centimeter abrasion on Mrs. Josephs' arm to which, after cleansing the wound, he applied a butterfly stitch, described as "basically a piece of sterile tape across the cut." Mrs. Josephs was discharged immediately and was not required to return to the hospital. Her left forearm was found to be "nontender" with "full range of motion."

Defendant, arguing that he was arrested solely because he was wearing a maroon jacket, offered a defense of misidentification. Acquitted of robbery in the first degree (threatened use of a dangerous instrument), he was, however, convicted of robbery in the second degree, based upon a finding that he caused physical injury to Mrs. Josephs in the course of the robbery.

(Additional statutory authority: Mental Hygiene Law, § 9.01) Pursuant to section 730.20 of the Criminal Procedure Law and 22 NYCRR 100.2 (b), as adopted by section 9.1 of this Title, the following hospitals are certified as having adequate facilities to examine a defendant to determine if he is an incapacitated person:

(a) Bellevue Hospital Center, New York, New York

(b) Binghamton Psychiatric Center, Binghamton, New York

(c) Buffalo Psychiatric Center, Buffalo, New York

(d) Central Islip Psychiatric Center, Central Islip, New York

(e) City Hospital Center at Elmhurst, Elmhurst, New York

(f) Edward J Meyer Memorial Hospital, Buffalo, New York

(g) Gowanda Psychiatric Center, Helmuth,, New York

(h) Grasslands Hospital, Valhalla, New York

(i) Harlem Valley Psychiatric Center, Wingdale, New York

(j) Hudson River Psychiatric Center, Poughkeepsie, New York

(k) Kings County Hospital Center, Brooklyn, New York

(l) Kings Park Psychiatric Center, Kings Park, New York

(m) Marcy Psychiatric Center, Marcy, New York

(n) Meadowbrook Hospital, East Meadow, New York

(o) Middletown Psychiatric Center, Middletown, New York

(p) Pilgrim Psychiatric Center, West Brentwood, New York

(q) Rochester Psychiatric Center, Rochester, New York

(r) Rockland Psychiatric Center, Orangeburg, New York

(s) St. Lawrence Psychiatric Center, Ogdensburg, New York

(t) Richard H. Hutchings Psychiatric Center, Syracuse, New York

(u) Utica Psychiatric Center, Utica, New York

(v) Willard Psychiatric Center, Willard, New York

for clerk of courts
70448-22 false Arrest· 1983
along with Exhibits of proof 3
sections (I need a lawyer cause C.O.
Martin leaving again for 8 months cant send mail

74 Misc.3d 927 (2021)
160 N.Y.S.3d 829
2021 NY Slip Op 21351

THE PEOPLE OF THE STATE OF NEW YORK ex rel. ERIC M. BURSE, ESQ., on Behalf of RELATOR G, Petitioner,

v.

VINCENT SCHIRALDI, Commissioner, New York City, Department of Correction, Respondent.

Index No. 21-53252.

Supreme Court, New York County.

Decided December 22, 2021.

928 *928 *New York County Defender Services* (*Eric M. Burse* of counsel) for petitioner.

*NYC Department of Correction* (*Benjamin Lee* of counsel) for respondent.

*Cyrus R. Vance, Jr., District Attorney* (*Daniel Makofsky* of counsel), interested party.

## OPINION OF THE COURT

APRIL A. NEWBAUER, J.

In this writ of habeas corpus, Relator G[1] challenges the legality of his pretrial detention at Rikers Island. Relator G's sole claim is that his pretrial detention is unlawful under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. This writ was filed in the wake of a motion to seek relief under a federal consent decree in *Nunez v City of New York* (US Dist Ct, SD NY, No. 11 Civ. 5845 [LTS][JCF]).[2] This writ not only corroborated the independent monitor's general findings in *Nunez*, but gave them a specific human face. Based on the credible testimony and overwhelming supporting video evidence of deliberate indifference, the writ is sustained and the application to release Relator G is granted. The court makes the following findings:

929 *929 **Procedural History**

Relator G, having been charged with burglary in the first degree, was committed to the custody of the New York City Department of Correction (DOC) at his New York County Criminal Court arraignment on June 21, 2021. Relator G filed the instant writ on October 4, 2021, pursuant to CPLR 7002(a) and (b)(5). In the petition, Relator G argued that his continued pretrial detention violated both the New York State and Federal Due Process Clauses. In the absence of a finding of a constitutional violation, Relator G asked the court to hold a bail hearing. Following a prehearing conference, Relator G withdrew his New York State constitutional claim and his request for a bail hearing. As a result, the sole claim at issue is whether Relator G's pretrial detention is unlawful under the United States Constitution.

Pursuant to CPLR 7009, and because there were material issues of fact raised by the paper submissions, the court held an evidentiary hearing on the writ. At the hearing, Relator G testified on his own behalf and was cross-examined by DOC counsel. Based on its status as an interested party, the Manhattan District Attorney's Office also participated in the hearing and made legal arguments. (*See* CPLR 7009[a][3].) However, the court denied the District Attorney's request to cross-examine witnesses as the sole issue raised by Relator G concerned prison conditions at Rikers Island and the deliberate indifference of DOC officials.

On Friday, November 5, 2021, at the close of petitioner's case, DOC announced its intention to call witnesses. The court then granted the petitioner's application to have Relator G released on electronic monitoring pending a decision on the writ. (*See* CPLR 7009[e].) The court found that Relator G established a substantial likelihood of success on the merits and a significant threat of retaliatory violence due to the filing of this writ. (*See Strachan v Soloff*, 157 AD2d 122 [1st Dept 1990]; *see also Mapp v Reno*, 241 F3d 221 [2d Cir 2001] [noting that federal courts have inherent authority to admit individuals to bail pending disposition of the merits of the habeas petition provided that petitioner raises "substantial" claims and shows that "extraordinary circumstances" exist that make the grant of bail necessary].)

## Facts

930 Throughout his testimony, Relator G described squalid conditions, rampant violence among and to detainees, and a lack of *930 essential services such as food and water; Relator G ascribed these conditions mostly to a lack of supervision of other detainees who bullied and commandeered resources. DOC admitted Relator G to an intake unit on Rikers Island on June 21, 2021. Relator G testified that he was held in the intake unit with about 15 other individuals for three days—well past the 24-hour time frame in which inmates are required to be assigned to a housing unit. (*See* Second Remedial Order in *Nunez* at 3 [Sept. 29, 2021].) This small intake unit had one bathroom and no mattresses or blankets. After three days in the intake unit, correction officers (hereinafter COs) transferred Relator G to a 50-person housing unit at the Otis Bantum Correction Center (OBCC). While at OBCC, inmates physically assaulted Relator G, after which he was taken to a segregation unit for three days and then to a 50-person housing unit at the George R. Vierno Center (GRVC). At this unit, Relator G

once again was assaulted, this time by as many as four detainees, who attacked him with sharp objects fashioned from plastic and metal.[3] Relator G received the sum total of two ibuprofens from medical staff to treat injuries from the assault, which included a black eye and bruised ribs.

After the second assault, DOC officials moved Relator G to the intake area at GRVC, where he stayed for 11 days. At the GRVC intake, Relator G was by himself in a small cell with no blankets or mattresses. He could not leave the cell. Relator G testified that he attempted to get the attention of DOC officials to move him out of intake but that they could not do so because of staffing shortages. Relator G testified that during both of his stays in intake units at Rikers, there were days in which he received no food at all. On the days he did receive food, he received no more than one meal per day, which typically consisted of a single bowl of cereal and several scoops of jelly. After this 11-day stint in intake, DOC transferred Relator G to unit 5B, another 50-person housing unit at GRVC.

During his testimony, Relator G depicted a state of affairs at Rikers where a skeleton staff of COs ceded control of basic jail
**931** operations to other selected incarcerated individuals, whom \*931 Relator G referred to as "the leaders." Relator G testified that the leaders at the various housing units controlled other detainees' access to food, with the leader receiving meals first and then rationing out the remaining food to the other detainees. The leaders would also control the supply of water in the cell block by directing COs to place the unit's water jug in the cell of a detainee loyal to the leader, i.e., a sidekick. Relator G also testified that he had to request permission of the leader in his cellblock to make phone calls, furthering an atmosphere of fear and intimidation.

Relator G offered uncontradicted testimony that he received no recreation time for months. After the writ was filed, for the first time, a recreation team appeared in cellblock 5B. However, Relator G testified, and video surveillance shows, a CO attempting to take the inmates of 5B out of the housing unit to "the yard" for recreational time, only to be overruled by the leader. Relator G testified that he overhead the leader arguing with the recreation COs, with the leader saying that it was "too early" for recreation and that they should come back later. The video supports this testimony as the leader is shown waving and gesturing to the recreation COs. They then leave the unit.

Relator G also testified to a "fight night" incident on October 19, 2021, whereby the leader of 5B forced other inmates to fight each other inside a cell while the rest of the inmates in the housing unit crowded around and cheered. The cells in this unit have concrete floors and metal bedframes and toilets. After witnessing two fights, the leader tapped Relator G on the shoulder, indicating that he was being selected for the next fight. The leader then had Relator G fight another inmate with full force until the leader gave permission to stop. The leader then brought Relator G to his cell, where Relator G received cigarettes and extra food as a reward for fighting. Relator G testified that COs within the housing unit had full knowledge of what was happening during the fight night. Relator G testified —and video surveillance corroborates—that after the first two fights, a female CO approached the leader to tell him to "quiet things down" and make the violence appear less obvious to COs stationed where this could be observed on the monitors. The video surveillance also shows one CO watching several of the fights from an elevated position on the second tier of the housing unit. At no point did any correction official attempt to break up the fights.

**932** \*932 During cross-examination, DOC counsel repeatedly asked why Relator G never reported any incidents of violence or poor conditions to DOC staff. Relator G testified that he did not submit a complaint to DOC staff because he had heard about instances of retaliatory violence against those who filed complaints, including an inmate who was jumped after complaining about the leader not allowing him to use the shower. Relator G testified that he felt compelled to participate in the fight night because he feared retaliatory violence if he refused.

The court finds Relator G's testimony credible for several reasons. First, DOC's video surveillance footage corroborates most of Relator G's allegations. Relator G's testimony about the fight night incident perfectly matches the video footage from that night. Similarly, Relator G's claim about the leader overruling a CO about recreational time can also clearly be seen in the video footage. Additionally, the federal monitor's reports in *Nunez* further corroborate much of Relator G's testimony. The monitor's reports detail how Relator G's lengthy periods in intake are part of a larger systemic pattern in which delays in transferring detainees out of intake causes delays in providing medical services to detainees. The monitor also notes the lack of mandatory recreation, and that food and other basic services are not routinely provided to detainees in intake, which is consistent with Relator G's testimony of lack of food and medical treatment while in intake.

In addition to this corroborating evidence, the court notes that DOC failed to present any evidence that might contradict the major allegations raised by Relator G in his testimony. DOC chose to call only one witness, CO Abdul Khlek, to testify during the hearing. Officer Khlek's testimony was limited to subjects of limited relevance to Relator G's claims, such as DOC policies regarding the securing of cell doors at night and viewing of surveillance footage. The petition does not challenge DOC's stated procedures, but rather the actual practices that have come to pass at this facility. While Officer Khlek is regularly stationed in unit 5B, he was off duty during the fight night incident. He had no personal knowledge of any of the violent incidents described by Relator G and captured by the video surveillance footage, or anything to offer about the intake units. DOC had every opportunity to call COs who did have personal knowledge of these incidents and to rebut the claims made by Relator G, but elected not to. As indicated below, the silence spoke volumes.

**933** \*933 Law

The US Constitution "does not mandate comfortable prisons." (*Rhodes v Chapman*, 452 US 337, 349 [1981].) However, it does not permit inhumane prisons either. (*Farmer v Brennan*, 511 US 825, 832 [1994].) Specifically, the Supreme Court has interpreted the Eighth Amendment's prohibition of "cruel and unusual punishment" as imposing duties on prison officials to provide humane conditions of confinement, ensure that inmates receive adequate food and medical care, and take reasonable measures to guarantee the safety of inmates. (*See e.g. Brown v Plata*, 563 US 493, 508 [2011]; *Farmer*, 511 US at 832; *Hudson v Palmer*, 468 US 517, 526-527 [1984].) Additionally, prison officials have a duty to protect prisoners from

cross-examination that he was only mildly scraped up when forced to fight by the leader, this is not a defense v individuals who have no other recreation are then compelled to go at one another, unsupervised, in an enclosed consisting entirely of concrete and metal. Further, aside from the control by the leaders, the court finds that DOC provide Relator G with adequate food and medical care on an ongoing basis, particularly within the intake units. 1 conditions of confinement are sufficiently serious to pose a risk of serious damage to Relator G's physical and me. soundness. Furthermore, DOC officials knew about these conditions and failed to take reasonable care to mitigate excessive risks to Relator G's well-being.

Additionally, although not addressing the main claim, Dr. Ronald Paynter testified that in his opinion, Relator G receiv inadequate medical care during his detainment at Rikers. Dr. Paynter diagnosed Relator G as suffering from anxiety, and moderate drug dependency. Upon arriving at Rikers, Relator G had a mental health appointment where he was prescribed a two-week course of medication to help with drug withdrawal. However, Relator G only received one dose day and never received any other doses of the withdrawal medication. Relator G also testified that he never received ai additional mental health medication throughout his time at Rikers. Relator G also testified that after testing positive for COVID-19, he was removed to another housing area for only two days and returned to the same housing unit without any explanation. While these claims of insufficient medical care would not be sufficient in and of themselves to sustain the wri Relator G's testimony fits the overall pattern of DOC failing to provide adequate medical care to detainees on Rikers Island (See Matter of Agnew v New York City Dept. of Corr., Sup Ct, Bronx County, Dec. 6, 2021, index No. 813431/2021E.)

937    *937 DOC points out that two courts of coordinate jurisdiction have recently dismissed writs based on the current conditions at Rikers (People ex rel. Belkin v Schrialdi, 2021 WL 7278945 [Sup Ct, Bronx County 2021]; People ex rel. Rodriguez v Schiraldi, 2021 NY Slip Op 32976[U] [Sup Ct, NY County 2021]). In denying the respective habeas writs, both courts found that the petitioners failed to establish deliberate indifference. The case at hand differs markedly from these two decisions. First, the petitioner in Rodriguez mainly challenged his bail conditions rather than the actual jail conditions at Rikers. Second, unlike the petitioner in Belkin, Relator G's claims of horrific personal treatment were neither "exaggerated" nor "fabricated." (Belkin, 2021 WL 7278945, *2.) As discussed above, DOC's video surveillance and the Nunez monitor's reports largely corroborate Relator G's claims of violence and inadequate medical care. Neither court actually held a fact-finding hearing. No similar findings of fact were made in Rodriguez or Belkin.

In Belkin, the court of the Supreme Court, Bronx County, acknowledged that conditions at Rikers are "deplorable" and "deadly serious." (Id. at *1.) Nonetheless, the court dismissed the writ indicating that the petitioner's claim fell short of meeting the deliberate indifference standard in part because "there is no proof that these conditions affect relator in any way different from any other detainee." (Id.) To this court, it is not at all clear why a habeas petitioner would need to show that they have suffered an injury that is unique as compared to other detainees. As discussed above, the deliberate indifference standard has two prongs, neither of which requires a showing of unique injury. In fact, reading in this type of requirement would mean that habeas petitioners would be less likely to prevail as overall prison conditions deteriorate as a petitioner will likely experience some unacceptable risk of harm that is at least partially connected to the risks that all detainees within the same correctional facility might face. Such a perverse outcome undoubtedly runs contrary to the due process protections afforded to pretrial detainees, as well as the Eighth Amendment's prohibition against cruel and unusual punishment.

DOC also objects to release in this case because it fears that granting Relator G's writ application will open the floodgates to challenges from other detainees who experience similar conditions at Rikers, resulting in an unwelcomed intrusion into

938    DOC's day-to-day operations. Yet courts cannot shrink from *938 the obligation to rectify constitutional violations against incarcerated individuals "simply because a remedy would involve intrusion into the realm of prison administration." (Brown v Plata, 563 US 493, 511 [2011]; see also People ex rel. Stoughton v Brann, 67 Misc 3d 629 [2020] [granting the temporary release of 18 pretrial detainees at Rikers as a result of the COVID-19 pandemic].) Moreover, the same or similar relief is being sought in two pending class actions, but here Relator G has proved his individual case.

In short, DOC did not meet its due process obligations to Relator G, and as a result, the court must remedy the constitutional violation by granting Relator G's release. This is not an outcome without consequence. The respondent and his superior utterly failed the public as well as this relator by ignoring the looming threat of a crisis at Rikers Island, by delaying emergency measures as staff shortages increased, and by not adopting an "all hands on deck" approach to this entirely foreseeable crisis. Respondent and his superior's failures are well documented in the latest report of the Nunez monitor as well as the recent decision in Matter of Agnew v New York City Dept. of Corr (Sup Ct, Bronx County, Dec. 6, 2021, index No. 813431/2021E).

Management is a process of planning and organizing to address foreseeable crises, not only of controlling immediate crises. In this case, the lack of management by respondent, and presumably by his superior, was tantamount to deliberate indifference. Not all the CO staff were individually deliberately indifferent, but they were placed in an untenable position, as the video of the lone officer trying to stave off an attack involving four detainees with a single can of pepper spray aptly illustrates. As a result of glaringly obvious mismanagement, Relator G has not only suffered at the hands of violence-prone detainees, but also lacked adequate food, exercise, and health services.

Important to the larger understanding of this case, respondent's deliberate indifference has obligated this court to release a detainee who is alleged to have committed a violent felony offense, for which the Manhattan District Attorney's Office requested that bail be posted. Moreover, this court had set bail, finding that bail was the least restrictive means to ensure Relator G's return to court under the factors enumerated in CPL 510.30.

939    *939 For the foregoing reasons, the court sustains this writ of habeas corpus and orders Relator G's release.

[1] The court has shielded the petitioner's name in response to a request to anonymize this written decision. Because of the threat of violence to Relator G due to the filing of this writ and the court's perception of the respondent as unable to prevent violence at this time, the court refers to the petitioner as "Relator G."

Case 1:23-cv-07063-LTS   Document 1   Filed 08/08/23   Page 60 of 65

[2] On August 18, 2011, a class of prisoners filed a lawsuit against the New York City Department of Correction under 42 USC § 1983 for cruel and unusual punishment. On October 21, 2015, Judge Laura Taylor Swain of the Southern District of New York approved a consent settlement with the court enforcing implementation of the terms of the settlement. The consent settlement included provisions prohibiting certain types of force and mandating new reporting procedures for all use of force events. As part of the consent settlement, the parties also agreed to an independent court-appointed monitor who would write progress reports every four months. Since implementation began, the monitor has repeatedly reported that the City has established a record of noncompliance with the most fundamental goals of the consent settlement. The case remains ongoing.

[3] Relator G introduced DOC video surveillance of this incident. The video shows that before the assault, one of the attackers covered the pantry camera with a towel, obscuring the video footage for approximately two hours. When the video resumes, it shows the assault spilling out of the pantry and into a hallway area. At this point, a female officer is seen with a can of pepper spray pointing and spraying it at multiple detainees who are wielding weapons and throwing large objects at her and Relator G.

Save trees - read court opinions online on Google Scholar.

this is my 3rd submission
Judge Swain of (nunez monitor)
Ive Been keeping you updated for
This of documents) I need immediate e
ctronic release till Hearings for my
release is over my life is in danger Ex rel
People Bourse v schraldi ten times worst 10x Realtor CGI

supreme court of the state
of new york

in the matter of Andre
AntroBus

Application
of Release
of a electronic
monitor
(C.P.L.R § 7009(a)

Application of Release on Electronic
moniter pending writ & Bail hearings

I Andre AntroBus Being duly Sworn says
on July 10, 2023 comes to court to
Begged That the sheriff put on a
electronic moniter. Pending the
out come of Writ and Bail hearings
in threat of further. Retaliation to
extreme serious danger to life and limb.'
cause on the date of 07-10-23 the
petitioner was threatened with serious
imminent injuries from D-O-C employees.
on several occasions The petitioner
Knows the writ suppose to be answer-
ed in crim sup. But requested it
be held in virtual court with

cont pg 2

with writ court Judge Delores Thomas
in sup. ct 360 adams cause he
know from first hand sup ct crim
div 320 Jay ct was going to mis-
direct with fraud and Ruses to prejudice
the petitioner! which they did adjourn-
ing the case till 09-06-23 putting his
life and limb in serious danger of Ret-
aliation as stated in original writ.
   So petitioner begs the court to Auto-
matically and sheriffs to Arrest and
put him on electronic monitor pending
all hearings (bail, evidentry, writs and etc)

### Affidavit of witness

1) several months of retaliation from
   employees and inmates the employ in Doc
2) injuries and every other day assaults,
   (cuttings, stabbings, 200° burns and assaults)
3) denying mail and opening of exonerating evid-
4) unreasonable siezures of him and others
   nec for liberty and freedom by force and fear.

24)  2000   908          X                    X Jovan   X
     Stephney Campbell    X                    X MKS   895230215

28 U.S.C 1346 self notarized with above sig

Even the days before court in 9mod
c-o took evidence got Belligerent and
sprayed petitioner with bear spray. When
petitioner is not suppose to be sprayed
several witnesses in 9mod 01-08-23.

which petitioner as before ask for
c.c.t.v footage like 9 times before them
03-18-22, 06-09-23, 08-01-23, 12-11-22, 01-28-23
04-06-23, and etc of other incidents of
assaults and etc by Officers and inmates.

I sent several letters for the.
Delores thomas held my writ in her
court or oversee by physically supervise
sup crim pt 13 cause Judge Quirk denied
petitioner to fire Counsel, self representation
(people v trammell, fucetta v California)
also 70/30, 210.35, 190.50, 170.35 mot-
ions. (60 by no later 01-20-23 I should be Released)
so petitioner begs electronic monitor
for life and times as soon as the
court recieves this application

sig. ___ ___ ___
sig - 207-1-201-uu

sworn to me on ___
day of July

Astorbia Andre
595 co 00345
1818 Hanson st.
E. Elmhurst NY 11370

RECEIVED
AUG 03 2023
CLERK'S OFFICE
S.D. N.Y.



United states District court
Attn: clerk of courts also again to Judge
Swain to help with writ of 6×741 people
Bruce v schnalds, need some relief as Realtor for)
500 Pearl street
New York New York 10007


Post
b.c.





UNITED STATES POSTAGE
$ 009.80°
JUL 27 2023
0009043868
MAILED FROM ZIP CODE 11370

PRO SE OFFICE
RECEIVED
AUG - 9 2023

RECEIVED
AUG 08 2023
CLERK'S OFFICE
S.D.N.Y.